## WANN *v.* COE and another.

(*Circuit Court, D. Colorado.* June 21, 1887.)

1. EQUITY—JURISDICTION—RELIEF FROM HARD BARGAIN.
   The fact that a needy borrower of a large sum of money ($51,000, for example) is compelled by his necessities to agree to pay a high rate of interest, (16½ per cent., for instance,) and to submit to other hard exactions, affords no reason for the interference of a court of equity, especially where the security consists chiefly of stock on a western ranch, which must be marketed and sold before the loan can be repaid.
2. MORTGAGE—WHAT IS—ACCOUNTING.
   Plaintiff, to secure the loan of $51,000, conveyed his ranch, and the stock thereon, to defendants, it being agreed that defendants should manage the property, and reimburse themselves from sales. *Held,* that the *status* of defendants was that of mortgagees in possession, bound to exercise reasonable care and diligence in preserving the property, and in disposing of it for the benefit of all concerned; that if defendants unnecessarily removed stock to a distant and inhospitable region, where it was abandoned to the rigors of winter, defendants were chargeable for the consequent loss; that charges amounting to $60,000, for transporting and marketing cattle sold for $70,000, were, *prima facie,* so large as to challenge the closest scrutiny; that plaintiff was not bound to be content with charges in gross, in the accounts rendered by defendants, but was entitled to be furnished with explicit and itemized statements of expenditure; that certain charges, on their face extraordinary, should be investigated; and that the case was a proper one for reference to a master to state a true account between the parties, in accordance with the principles above suggested.
3. SAME—SETTLEMENT—EFFECT.
   A mortgagor, in order to get possession of the mortgaged property from the mortgagee in possession, and to save it from probable loss from mismanagement and abandonment, the mortgagee's management and accounts being such as to afford proper subjects for investigation at the hands of a court, agreed with the mortgagee on a certain sum as the balance due. *Held,* that he did not preclude himself from invoking the aid of a court of equity to compel a true account from the mortgagee. A payment made under such agreement should be treated merely as an item to be credited to the mortgagor.

In Equity.
*Wells, McNeal & Taylor* and *R. E. Foot,* for complainant.
*A. J. Poppliton* and *John L. Webster,* for defendants.

HALLETT, J. In the month of November, 1879, plaintiff owned a ranch in Nevada called "King's River," and a large number of cattle on the ranch. The title to this property was held by A. Stevenson & Son, of California, as security for a considerable sum of money due from plaintiff to them, of which the amount was not then known, but was afterwards settled and adjusted at $51,000. With a view to pay his indebtedness to Stevenson & Son, plaintiff applied to defendants at their place of business in Omaha, Nebraska, for a loan sufficient in amount for that purpose. Negotiations followed, resulting, as complainant claims, in an agreement in writing on the part of defendants to loan the money at 10 per cent. interest. Two thousand beeves from the King's River ranch were to be sold in eastern markets, and the proceeds applied in satisfaction of the loan. Defendants deny that any agreement was made con-

cerning the loan at Omaha, in November, 1879, but say that the parties then came to an understanding that the property should be examined, and, if found to be good security for the amount, defendants would loan the money at 18 per cent. per annum, with payment of their expenses and for services in a manner to be more fully stated further on.

The issue thus presented is contested through a large part of the great volume of testimony taken in the case, by which plaintiff's purpose seems to be to modify, or perhaps supersede, the contract as finally settled between the parties. The final contract was made January 9, 1880, at Winnemucca, Nevada, after some examination of the King's River ranch, and the stock thereon, by Mr. Coe, one of the defendants. In form it was an absolute conveyance of the property from Stevenson & Son, and Mann, the complainant, to defendants; but there was executed at the same time an agreement showing that the property was held by defendants as security for money advanced by them to complainant. In this agreement the conveyance to defendants was referred to, and the payment therefor of $51,000, and then the manner of disposing of the property with a view to repay defendants' advances is stated in words as follows:

"Now, whenever said party of the first part shall have received from the sales of said cattle, horses, lands, etc., or a part thereof, the full sum of fifty-one (51) thousand dollars; also shall have received from said sales the full amount of moneys disbursed for expenses incurred for care, custody, and marketing said property; and for moneys paid for taxes on said property; and for moneys, if any, paid to the state of Nevada for balance due on said lands; and for moneys paid to other parties for perfecting titles, and recording the same; and for moneys paid upon orders of said party of the second part; and for wages of Isaac Coe and Zeri Carter, either or both, at the rate of ten dollars per day, and their expenses, while engaged in and about the care, custody, or other business connected with said stock; and for expense, time, etc., of said Coe up to and including date hereof; and for all moneys paid to said party of the second part, or on his orders, within ninety days prior to this date; and for moneys paid to Thomas Dean, to redeem certain certificates of location of lands; and all other expenses incurred, or to be incurred, of every name and nature, for the care, custody, or marketing said stock, with interest thereon at the rate of sixteen and one-half (16½) per cent. per annum for expense, wages, advances of moneys, etc.,—then said party of the first part is to convey to said party of the second part, by quitclaim, all property remaining of what was purchased from said Stevenson, except what has been or may be disposed of, to pay the said parties of the first part the purchase money, wages, and all and singular every item of expense incurred or to be incurred, as hereinbefore recited or otherwise, with interest thereon at the rate hereinbefore recited, unless prevented by legal process from doing so, not of their own volition; the intention being to realize on the sales of live-stock, if possible, until the parties of the first part shall be paid all sums of money due, or to become due, under this agreement. Account of sales to be rendered as often as practicable, say thirty days, said account to be sent by mail to any point said party of the second part may direct in writing. Account of receipts and disbursements to be rendered upon the final accounting, and as much oftener as practicable. It being impossible to estimate the number of cattle, horses, etc., that will bring the amount of money due, or to become due, to said parties of the first part, it is hereby stipulated that any moneys left in the hands of said parties of the first part, from the sales of any and all

of said property after they shall have received the amount of money expended, and interest thereon, as hereinbefore recited, shall revert to said party of the second part."

Plaintiff's position is that this instrument is much harder on him than the first agreement made in Omaha, in that the rate of interest is 16½ per cent., instead of 10 per cent.; that it provides wages for defendants at $10 per day, and gives power to sell all the property, instead of a limited number of feeders; and that he was compelled to sign it by defendants' conduct in bringing him into the presence of his creditors under promise of giving him the money on more favorable terms.

Upon all the evidence, the fact that such agreement was made at Omaha in November, 1879, is not well established. It is said to have been written, and afterwards lost. It is denied by defendants, and not distinctly affirmed by any one excepting complainant. Its terms were such as were not likely to be accepted before the property was examined, and the amount to be loaned ascertained. But it was clearly made out. The act of the parties in substituting for it the agreement of January 9, 1880, should be regarded as revoking it. At the date of the last agreement the parties had arrived at an understanding of their affairs. The property had been examined to some extent, and the amount due Stevenson & Son had been ascertained. Inquiry had been made concerning the cost of conveying the property to a distant market. Generally, the parties were much better informed as to all that was to be done concerning the property than they were in the month of November preceding. There was nothing in the situation to hinder or prevent independent action on the part of complainant as well as defendants. It is true that complainant was much in need of money, and apparently there was no one but defendants at hand who could and would furnish it. But this is not an extraordinary situation, from which the law can furnish a means of escape. A needy borrower, being *sui juris*, and under no other duress than that which comes of his circumstances, must, in general, perform his contract, whatever its terms may be. Courts have, indeed, refused to enforce contracts which were harsh and unconscionable, but there will usually be found some element of fraud in any such case; and if, in any instance, the judgment appears to be based on the nature of the contract above, the contract will be found to be so erroneously wrong as in itself to afford evidence of an intention to cheat and swindle. This case is not within any rule of that kind.

As before suggested, plaintiff was in full possession of his faculties, and was under no sort of constraint, except that he wanted money, which he could not obtain from any other source, and was therefore compelled to accept defendants' terms. In the nature of the property which was to be security for the loan, the disposition to be made of it, with a view to repay the money, and the time for which the loan was to run, there was some reason for demanding a high rate of interest, the expenses of the trust, and payment for defendants' services; so that all that was embodied in the contract was at least a proper subject for consideration. And the circumstance that the defendants exacted a high rate of interest,

and other hard conditions, will not avail to avoid the contract, or substitute for it an earlier agreement, if any such was made.

Immediately after the property was conveyed to defendants, they took possession, and set about removing the cattle and horses from the King's River ranch to Medicine Bow, in Wyoming territory. In the spring and summer of 1880 they carried to Wyoming 164 car-loads of all classes of horned cattle, containing 4,000 to 6,000 head. The number so carried is an important part of the controversy, and the court has not sifted the testimony with a view to decide it. The agreement of January 9, 1880, bears on its face evidence of great care and consideration in respect to all its terms and provisions, and it is very remarkable that it contains nothing about removing the cattle and horses from Nevada to Wyoming, and from Wyoming to the Missouri river. That was an important feature of the enterprise, involving large expense in the transportation of the stock, as well as the price to be obtained in another market. The very general language of the agreement—"said property to be marketed at the discretion, and according to the best judgment, of said parties of the first part, in the manner which, in their opinion, will bring the largest amount of money"—confers authority only to sell in the usual market for the country in which the property was situated. That market was probably Nevada or California, certainly not in Wyoming or further east. The parties agree that the beeves or feeders in the King's River herd were to be shipped east for market, but complainant asserts that no other cattle were to be taken from the ranch. A great deal of testimony in the record is directed to this point, and it is exceedingly difficult to come at the truth of the matter. The testimony has been fully considered, but I am not inclined to discuss it at length. It is not possible, in view of the testimony, to follow the language of the contract; and as, by the concurring statement of all parties, some of the cattle were to be sent to Wyoming, it is perhaps as well to say that all were included in that understanding.

As before stated, a large number of cattle and horses were taken by defendants from King's River ranch to Medicine Bow, Wyoming, and there they were kept for some time. And some of them were sold at or near Medicine Bow, and others were transported to Omaha, and possibly to other points or places on the Missouri river, and there sold. The expense of these proceedings was enormous, so large, indeed, as to challenge scrutiny upon a statement of the amount. From the sale of something over 3,000 head of cattle, there was realized something like $70,-000, of which, after paying expenses and some small advances to complainant, less than $10,000 remained to apply on the original loan of $51,000. The necessary expense of handling and transporting cattle by rail for great distances is not overlooked, but, with all due allowance in that direction, such figures seem to call for investigation. Whether overcharges have been made, can only be ascertained by patient and careful examination of each charge; but some of the items in the account rendered by defendants to plaintiff seem to be extraordinary. As an instance, defendants have charged for about 267 days' service in a period

of about 10 months, under that clause of the agreement which allows them $10 per day for time devoted to complainant's business. In the month of May, 1880, one defendant sets down 30 days and the other 26 days to complainant's service, with a slight deduction on account of another transaction, making a charge of $471.47 for personal services, in addition to expenses for one month in managing and superintending complainant's business. There is little room to doubt that such charges are excessive. So, also, defendants' method of keeping the accounts is open to criticism. It was common practice to charge the foreman of a party of laborers with a gross sum of money, leaving the matter of the proper disbursement and appropriation of the money to presumption only. The items of $50, July 10, 1880, and $100, July 29, 1880, entered to W. C. Wilson, may be cited as illustrations. In the testimony they are mentioned as necessary expenses. It is altogether probable that all or some part of this money was necessarily expended about the business, but complainant was entitled to a more explicit statement of the use made of it. Merchants' accounts with defendants are charged to complainant in gross, and the explanation is that the goods were bought for his use, or by men employed to take care of his herd. Accounts of hotel men are entered against complainant in the same manner. Perhaps the best illustration of the extraordinary plan of keeping the accounts is found in 30 entries, mainly for postage-stamps, although there are two or three charges for postal-cards and envelopes. These charges amount to $38.86 in all, and it is said that part of the stamps were used by defendants in and about complainant's business, and the remainder were given to workmen for their use, and charged to them. But it is not intended to go over the accounts in detail, and decide upon their merits. It is enough to say that they are of a character to be probed and sifted by a master, with a view to allow all that may be properly and justly chargeable to complainant, and reject the remainder.

Thus far in the discussion we have proceeded on the assumption that defendants were in a position to account to plaintiff for their dealings with the property, and it seems not at all necessary to discuss that proposition. The contracts of the parties were not individually or collectively in the form of a mortgage; but they conveyed the property to defendants as security for money loaned, and gave them possession, with power of sale, to the end that they might reimburse their advances. Nothing more was required between the parties to put defendants in the position of mortgagees in possession, bound to exercise reasonable care and diligence in preserving the property, and in disposing of it for the advantage of all concerned. Whether this was done by defendants is another issue strongly contested in the record. Not much was said in argument in derogation of sales of stock made by defendants, although it was claimed that in some instances the animals were not properly marked, so as to prevent purchasers from taking more than they were entitled to. In general, it may be assumed that the number and quality of animals sold, and the price obtained for them, is correctly stated by defendants. Nor is the price obtained for them assailed; but complain-

ant asserts that a large number brought up from Nevada are not accounted for in any way, and some of them were carried away to remote parts, in a secret manner, and there sold for high prices. That some were left on the Medicine Bow range in the fall of the year 1880, without care or attention from any one, seems to be conceded by all parties. How many, must depend upon the other question, as to how many were brought up from Nevada. If from the whole number taken from Nevada the number sold by defendants at Medicine Bow and Omaha and other places be deducted, and allowance be made for losses, the result should be the number remaining at Medicine Bow in the fall of the year 1880. The evidence fails to show that any of the cattle were clandestinely carried off to Nebraska and Missouri, or that the cattle found there having similar brands were taken from plaintiff's herd. The evidence, as to the brands on the cattle fed in Nebraska and Missouri in the year 1881 being the same as the brands on plaintiff's cattle, is, indeed, quite convincing, but there is nothing to show that the cattle so fed were brought up from Nevada by defendants. On the contrary, the evidence tends to the conclusion that the remainder of plaintiff's herd, after deducting those sold by defendants, were not of the class of those found in Nebraska and Missouri, or that not many of them were of that class; and there is direct testimony to show where the Nebraska and Missouri cattle came from. It may be that some of plaintiff's cattle, during the years 1880 and 1881, fell into passing herds, from want of care on the part of those in charge of them, or because there was no one in charge of them, and that such cattle were driven off to Nebraska or Missouri, or other distant places. But the notion that defendants clandestinely carried off some of the cattle, and secretly sold them, and appropriated the proceeds of such sales to their own use, is entitled to no consideration.

The real question is as to the cattle on the range at Medicine Bow in the fall of the year 1880, when the last shipment was made to Omaha, and whether defendants shall account to plaintiff for their value. Of the general principle that a mortgagee, who takes possession of the property mortgaged for the purpose of satisfying his debt, is bound to account to the mortgagor for the property itself, or its proceeds, it is unnecessary to speak. As before stated, a large number of cattle were left on the Medicine Bow range in the fall of the year 1880; abandoned, it would seem, to the rigors of the winter then at hand, or to any one who might be inclined to take them. The cattle were in a country with which they were not acquainted, and to which they had been brought by defendants in the preceding spring and summer. Under the circumstances, they were not likely to maintain themselves in that country, nor was it probable that such as could survive the winter would remain within reach. In thus leaving the cattle on a range new to them, without provender and without care or protection, there was no reason to expect that they would be recovered. It is useless to say that no other course could have been adopted in that country. If it is true that the country afforded no means of support, the cattle could have been

sold or driven to a more hospitable region. Upon all the evidence on that point, it ought to be said that in thus leaving the cattle to be dispersed by storms, and to perish on the mountains, and to be taken by any who were so disposed, defendants did not exercise the care for the property which the law imposes under such circumstances.

But it is urged that all matters in controversy between the parties were settled and adjusted by an agreement of date January 10, 1881, by which complainant agreed to pay to defendants the sum of $26,500, as the balance due to defendants for moneys advanced to him under the agreement of January 9, 1880, and to accept from defendants a conveyance of the King's River ranch, and all other property which had not been sold by defendants, wherever it could be found; that by the terms of this agreement complainant was to gather the cattle at Medicine Bow, and assume all risk of loss in that locality. It is believed, however, that the transaction of the parties in the fall and winter of the years 1880 and 1881, and the various papers by them executed at that time, should not be so interpreted. As before stated, defendants were mortgagees in possession of property whereof complainant was mortgagor. A large amount of the property had been sold by defendants, resulting in disastrous losses to complainant, and the course of defendants' administration had been such as to call for investigation. Apparently there was no intention on the part of defendants to proceed further in the execution of the powers conferred upon them in the several contracts between the parties. With a large part of their demands unsatisfied, defendants had left a considerable part of the property at Medicine Bow in a very dangerous situation. It was natural that complainant should be greatly concerned for the safety of the property which remained unsold, and seek by every means within reach to regain control and possession of it. As mortgagor, complainant had at all times the right to redeem the property unsold, by paying or tendering to defendants the balance due them. *Flanders* v. *Chamberlain*, 24 Mich. 305. Upon the accounts of receipts and disbursements rendered by defendants, it was difficult, if not impossible, to ascertain that balance within any reasonable time; and to proceed in equity for that purpose would result in great delay. Under the circumstances, complainant was at liberty to pay the whole or a part of the sum demanded of him, as might be necessary to have the property unsold returned to him, without concluding his right to call defendants to account for their administration of the trust. This was in fact done. Complainant paid the sum of $26,500 demanded by defendants, and the property was conveyed to him. But this was manifestly more in the way of redemption, and for securing the right to immediate possession of the property, than as a full and final settlement and adjustment of the amount due from plaintiff to defendants. In my judgment, the transactions which resulted in the payment by complainant to defendants of the sum of $26,500 constitute no bar to the present suit, and that sum is only an important item of the account to be made between the parties. As usual in cases of this kind, there are questions in a very voluminous record which are passed without notice. It is

perhaps due to counsel, who have bestowed much time and labor upon the record, and who presented the whole case in argument fully and elaborately, to say that these questions have not passed without consideration.

It is supposed that enough has been said to explain the result of this investigation without further discussion; that defendants ought to account with plaintiff before a master of the court for the reasonable expense of keeping, transporting, managing, and selling complainant's stock under the agreement of January 9, 1880; that defendants ought to account in like manner for the value of stock brought up from King's River ranch to Medicine Bow, and remaining unsold in the fall of the year 1880. In this computation allowance should be made for actual losses occurring without fault of defendants, and for casualties incident to the business during the summer of 1880, and up to the date of the last shipment from Medicine Bow. With these matters adjusted, an account may be stated between the parties, crediting plaintiff with money received from sales of stock, and the value of stock on hand in the fall of 1880, as stated in the last paragraph, and the $26,500 paid April 2, 1881, and debiting him as required by the agreement of January 9, 1880. It is believed that the evidence now in the record may furnish the necessary information upon all points embraced in the reference. If more evidence is required, application must be made to the court for an order in that behalf, and the application should state the point to be established, and the number of witnesses to be called, and the manner of taking the testimony.