**PREMIER FARM CREDIT, PCA,**
**Plaintiffs–Appellees and**
**Cross–Appellants,**

v.

**W–CATTLE, LLC; Ronny D. Wisdom;**
**and Lenee Y. Wisdom, Defendants–**
**Appellants and Cross–Appellees.**

**No. 05CA0444.**

Colorado Court of Appeals,
Div. IV.

Oct. 5, 2006.

Certiorari Denied April 9, 2007.

506

Block, Markus & Williams, LLC, Steven R. Rider, Denver, Colorado, for Plaintiffs–Appellees and Cross–Appellants.

Appel & Lucas, P.C., Gary R. Appel, Denver, Colorado, for Defendants–Appellants and Cross–Appellees.

Opinion by Judge J. JONES.

This is a lender liability case. Plaintiff, Premier Farm Credit, PCA (Premier), prevailed on its claim on a promissory note executed by defendants, W–Cattle, LLC; Ronny D. Wisdom; and Lenee Y. Wisdom. Defendants appeal various judgments and orders of the district court rejecting their defenses, counterclaims, and third-party claims, and Premier cross-appeals a judgment of the district court disposing of certain of its claims. We affirm.

## I. Background

Ronny Wisdom and Lenee Wisdom are the owners of defendant W–Cattle, LLC, a ranching and feedlot operation near Fleming, Colorado. In 1998, the Wisdoms applied for a loan from Premier, an agricultural lender incorporated under the Farm Credit Act, 12 U.S.C. § 2001, et seq. (FCA), for the stated purpose of funding W–Cattle's operations. In the financial statements the Wisdoms submitted, they represented that they had a net worth of over $4 million, and that W–Cattle's feedlot operations were very large and profitable. However, those operations were not nearly as large or profitable as represented. Further, the Wisdoms failed to disclose a liability to another lender in the amount of $1,298,031.85. Premier agreed to make the loan in reliance on the Wisdoms' representations.

On December 21, 1998, the Wisdoms, both in their individual capacities and on behalf of W–Cattle, executed a loan agreement, a promissory note, and a security agreement with Premier. Pursuant to the loan agreement, Premier issued a $6,001,000 revolving line of credit to W–Cattle. The express terms of the loan agreement required W–Cattle to use the line of credit to pay off an existing debt in the amount of $3,100,000, and to pay for expenses associated with operating the feedlot (for example, purchasing cattle, feed grain, and the like).

As collateral for the line of credit, defendants pledged large amounts of cattle, feed grain, farm machinery, equipment, and crops (both harvested and growing). The loan agreement required W–Cattle to maintain pledged liquid assets valued at 125% of the balance of the loan. In order to assure W–Cattle's compliance with this requirement, the loan agreement also required W–Cattle to submit "borrowing base" reports on a monthly basis. These borrowing base reports were to list cattle inventory, weight, and market value per pound; crop inventory; and other short-term liquid assets.

The lending relationship continued for several years. W–Cattle continued to draw on the revolving line of credit, and Premier, relying on the accuracy of the information contained in the monthly borrowing base reports (most of which Ronny Wisdom certified as accurate) and financial statements periodically submitted by the Wisdoms, continued to increase the amount available under the line of credit. Each year the parties executed a new loan agreement, each of which contained the borrowing base requirements contained in the initial loan agreement. By March 2002, the line of credit had been increased to $13 million. W–Cattle continued to draw on

this growing line of credit, purportedly to pay for additional cattle, feed grain, and other operating expenses.

In the spring of 2003, Premier became concerned about potential discrepancies between the actual value of the collateral owned by W–Cattle and the Wisdoms and the value they had reported in the monthly borrowing base reports. Despite Premier's concerns about the value of the collateral, on April 11, 2003, the parties executed a new loan agreement, promissory note, and security agreement, whereby Premier agreed to increase W–Cattle's line of credit to $14 million. As collateral for the April 11, 2003 loan, defendants granted Premier a security interest in all crops grown, growing, or to be planted or produced on the land described in the security agreement; all feed, grain, and harvested crops; all accounts and general intangibles; all prepaid expenses and supplies; all livestock; and all farm and ranch machinery and equipment.

As with the prior loan agreements, the April 11, 2003 loan agreement required that W–Cattle maintain pledged liquid assets valued at no less than 125% of the outstanding balance of the loan. The loan terms also included new reporting requirements for W–Cattle, including a requirement that W–Cattle submit monthly balance sheets prepared by an accountant.

Over the next several months, Premier became increasingly concerned about its collateral position. On November 4, 2003, Ronny Wisdom and third-party defendant Melvin C. Fritzler, Premier's president, met to discuss W–Cattle's financial situation. During that meeting, Ronny Wisdom agreed to allow Premier to conduct an onsite audit of the personal property collateral.

The audit was conducted on November 6, 2003, at W–Cattle's feedlot. The auditor prepared a report that day, which he submitted to Premier. The report indicated that W–Cattle owned somewhere between 1,300 and 1,700 head of cattle, far less than the 12,000 to 14,200 head W–Cattle had represented in its most recent borrowing base reports and financial statements. Based on the inspection report, Premier concluded that W–Cattle had been using loan proceeds for purposes other than those allowed under the loan agreements, and that the Wisdoms had been misrepresenting the value of collateral W–Cattle actually owned and the amount of grain it had purchased with the loan proceeds.

Because of Premier's concerns about the security for the line of credit, the Wisdoms agreed to execute deeds of trust on all real estate they owned to add value to the collateral base. On November 7, 2003, the Wisdoms came to Premier's office and executed an addendum to the April 11, 2003 security agreement (adding additional items to the collateral base) and two deeds of trust. One week later, the Wisdoms returned to Premier's office to execute a third deed of trust.

Defendants allege that on November 6, 2003, following the audit revealing the deficiency, at a meeting on the W–Cattle feedlot, Ronny Wisdom said to Fritzler: "I don't want a fight. Let's work this out." Fritzler allegedly responded: "Well, if you don't do it, we're going to have a fight. Come in, in the morning, and we'll discuss it." The following day, at the meeting at Premier's office, Fritzler told Ronny Wisdom: "We're not going to worry about cattle. We're not going to worry about the past. We're going to go forward from here." Based on these statements, defendants claim they assumed that the lending relationship between Premier and W–Cattle would continue, and that Premier was going to forbear from calling the loan due. They assert that, in reliance on those discussions, they executed the deeds of trust on November 7 and 14.

On November 12, 2003, W–Cattle submitted a balance sheet to Premier showing that W–Cattle owned $2,015,260 worth of cattle. This figure represented a decrease of over $11 million in the value of the cattle W–Cattle had claimed in its financial statements prepared in September 2003 and in its most recent borrowing base and inventory reports. W–Cattle failed to account for this discrepancy.

On November 17, 2003, Premier filed a complaint against defendants, asserting claims for breach of the promissory note, fraudulent misrepresentation, fraudulent con-

cealment, and conversion of collateral. It sought damages, replevin of the personal property collateral, the appointment of a receiver, and an accounting. The fraud claims were based on the allegation that the Wisdoms had misrepresented their financial status in originally applying for the loan in 1998. On the same day, Premier also filed a motion to appoint a receiver pursuant to C.R.C.P. 66 and provisions of the deeds of trust. The court granted the motion following an ex parte hearing on November 17.

Premier later filed an amended complaint against defendants, asserting the same claims and seeking the same relief sought in its original complaint, but alleging additional facts. Defendants filed an answer, as well as counterclaims against Premier and third-party claims against Fritzler. The counterclaims included claims for fraud, breach of contract, negligence, and breach of fiduciary duty and for a declaratory judgment that the deeds of trust and other documents executed in November 2003 were void. Fritzler was named as a third-party defendant on the tort claims. The fraud and declaratory judgment claims (as well as many of W–Cattle's and the Wisdoms' defenses to Premier's claims) were based on the central allegation that Fritzler deceived the Wisdoms into signing the deeds of trust. The other claims were based on allegations that Premier failed to perform inventories or keep accurate records of the collateral as required by the loan agreements and the parties' course of dealing, and that Premier had negligently failed to accurately keep track of draws and payments on the line of credit. According to defendants, these failures led them to borrow too much money.

Defendants also filed a motion to discharge the receiver, or alternatively, to restrict the receiver's powers, arguing that Premier had not presented any evidence that the collateral was in danger of being lost or impaired and that the deeds of trust, which contained receivership provisions, were void because of Premier's fraud. In response, Premier argued that evidence had been presented that thousands of head of cattle were unaccounted for, C.R.C.P. 66 authorized the receivership independent of the deeds of trust, no fraudu-

lent representations had been made by Premier, and defendants' fraud counterclaim pertaining to the deeds of trust was barred by the Colorado credit agreement statute of frauds, § 38–10–124, C.R.S.2006.

In early 2004, Premier filed a separate C.R.C.P. 120 action seeking an order authorizing foreclosure of the real property subject to the deeds of trust. The court consolidated that real property foreclosure action with the earlier case.

In the spring of 2004, the court held evidentiary hearings on defendants' motion to discharge the receiver and on the foreclosure action. Several witnesses testified, and the parties submitted substantial documentary evidence covering the history of their lending relationship.

Based on the testimony taken at the hearings, the court concluded that defendants had defaulted on the loan in numerous ways and that their various defenses were without merit. The court therefore concluded that the appointment of the receiver was proper.

As for the foreclosure, the court determined that the deeds of trust were valid and enforceable, but that defendants had a right under the FCA to attempt to restructure the loan before the foreclosure could proceed. Rather than dismissing the foreclosure action, as defendants had requested, however, the court stayed it pending compliance with applicable restructuring procedures. The Wisdoms' attempt to restructure the loan proved unsuccessful because Premier rejected the restructuring application. Premier subsequently foreclosed on the real property.

During the foreclosure and receivership, much of the collateral was liquidated. However, a deficiency remained. Consequently, Premier continued to seek judgment against defendants for the deficiency. Premier filed a motion for summary judgment on its claim for breach of the April 11, 2003 promissory note, and later Premier and Fritzler jointly filed a second motion for summary judgment on defendants' counterclaims and third-party claims.

The court granted Premier's first motion for summary judgment with respect to its claim for breach of the note. The court

concluded that § 38–10–124, the Colorado credit agreement statute of frauds, barred the admission of Fritzler's alleged promise to forbear, on which the defenses to the note were largely based, and that defendants' other defenses to the note were legally insupportable. The court further found that Premier was not obligated to conduct periodic field inspections or otherwise to take measures to assure that W–Cattle did not borrow too much. To the contrary, it held that W–Cattle was responsible, pursuant to the loan agreement, to prepare and submit accurate monthly borrowing base reports, based on its first-hand knowledge of its operations. Accordingly, the court concluded that there were no genuine issues of material fact and that Premier was entitled to judgment on its breach of promissory note claim as a matter of law. The court entered judgment on that claim against defendants, jointly and severally, in the amount of $11,204,956.84, plus post-judgment interest, and certified the judgment as final pursuant to C.R.C.P. 54(b).

Shortly thereafter, the court granted Premier's and Fritzler's second motion for summary judgment pertaining to defendants' counterclaims and third-party claims. The court concluded that to the extent defendants' claims were based on the alleged verbal promise to forbear made by Fritzler, they were barred by § 38–10–124. The claims for breach of contract and negligence based on Premier's alleged failure to maintain accurate records regarding W–Cattle's purchases and sales of collateral failed because there was no such duty in the contracts or under common law. Defendants' claim for negligence also failed because it was barred by the economic loss rule, and, to the extent it was based on the allegation that Premier had failed to keep accurate records of draws and payments on the line of credit, defendants had failed to demonstrate a genuine factual issue as to any such failure. The court granted summary judgment to Premier and Fritzler on the claim for breach of fiduciary duty because it concluded that there was no fiduciary relationship between the parties as a matter of law.

Two days before the court's ruling on the second motion for summary judgment, defendants filed a motion in limine relating to Premier's fraud claims. First, they sought to exclude any testimony at trial about any oral representations allegedly made by the Wisdoms to Premier, as barred by § 38–10–124. Second, they sought to exclude any testimony about any oral or written representations made by the Wisdoms to Premier prior to January 1, 2001, as barred by the applicable statute of limitations. Third, defendants argued that the economic loss rule barred any tort claim for damages duplicative of those damages sought by Premier on the note.

The court granted defendants' motion in limine. It concluded that § 38–10–124 applied to bar evidence of preloan discussions in 1998. The court also concluded that the economic loss rule precluded the recovery of damages on Premier's fraudulent misrepresentation and fraudulent concealment claims.

Thereafter, Premier, the receiver, and defendants stipulated that, in light of the court's January 25, 2005 order granting the motion in limine, Premier could not present sufficient evidence to support its fraud claims. The parties requested that final judgment be entered on those claims and all other claims, save for the continuing receivership, to allow the parties to appeal the various judgments. The court did so.

## II. Discussion

Defendants challenge three of the district court's orders on appeal: the orders granting summary judgment in Premier's favor on its promissory note claim, and in favor of Premier and Fritzler on defendants' counterclaims and third-party claims; and the order declining to discharge the receiver or dismiss the foreclosure action. Premier cross-appeals the order granting defendants' motion in limine pertaining to Premier's fraud claims, and the court's order granting judgment in defendants' favor on those claims.

### A. Standards of Review

#### 1. Rulings on Motions for Summary Judgment

Most of the issues on appeal pertain to the district court's orders granting the motions for summary judgment.

■ Summary judgment should be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c); *Raygor v. Bd. of County Comm'rs*, 21 P.3d 432, 435 (Colo.App.2000). We review the court's orders granting summary judgment de novo. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 298–99 (Colo.2003).

### 2. Rulings on Receivership and C.R.C.P. 120 Foreclosure

Almost all the other issues on appeal pertain to the district court's order refusing to discharge the receiver and staying (rather than dismissing) the foreclosure.

A receiver may be appointed before judgment when the applicant "establishes a prima facie right to the property, or to an interest therein, which is the subject of the action and is in possession of an adverse party and such property ... [is] in danger of being lost, removed beyond the jurisdiction of the court, or materially injured or impaired." C.R.C.P. 66(a)(1); *see also Oman v. Morris*, 28 Colo. App. 124, 127, 471 P.2d 430, 432 (1970).

■ The determination of whether a receiver should be appointed rests within the sound discretion of the district court. *Melville v. Weybrew*, 106 Colo. 121, 125, 103 P.2d 7, 9 (1940); *Jouflas v. Wyatt*, 646 P.2d 946, 947 (Colo.App.1982); *Oman, supra*, 28 Colo. App. at 127, 471 P.2d at 432. We will not reverse a court's decision appointing (or refusing to discharge) a receiver unless the court clearly abused its discretion. *Melville, supra*, 106 Colo. at 125, 103 P.2d at 9; *Jouflas, supra*, 646 P.2d at 947; *Oman, supra*, 28 Colo.App. at 127, 471 P.2d at 432. A court abuses its discretion only if its ruling is manifestly arbitrary, unreasonable, or unfair. *Colo. Nat'l Bank v. Friedman*, 846 P.2d 159, 166–67 (Colo.1993).

■ In a C.R.C.P. 120 proceeding, the court must determine "whether there is a reasonable probability that a default or other circumstance authorizing exercise of a power of sale has occurred." *Plymouth Capital Co., Inc. v. Dist. Court*, 955 P.2d 1014, 1017 (Colo.1998). In making this determination, the court should consider "all relevant evidence." *Plymouth Capital Co., supra*, 955 P.2d at 1017; *see also United Guaranty Residential Ins. Co. v. Vanderlaan*, 819 P.2d 1103, 1104 (Colo.App.1991) (citing *Moreland v. Marwich, Ltd.*, 665 P.2d 613, 618 (Colo. 1983)).

In concluding that defaults had occurred, that the receiver should not be discharged, and that the C.R.C.P. 120 foreclosure proceeding should not be dismissed, the court made factual determinations and applied various points of law. Our review of the arguments raised by defendants on appeal pertaining to the order declining to discharge the receiver requires us to examine both questions of fact, as determined in the first instance by the district court following evidentiary hearings, and questions of law.

■■ We will not disturb factual determinations made by the trial court, so long as they are supported by the record. *Coors v. Security Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo.2005) (citing *Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979)). We review questions of law de novo. *Jaynes v. Centura Health Corp.*, 148 P.3d 241 (Colo.App. 2006); *State v. The Cash Now Store, Inc.*, 31 P.3d 161, 164 (Colo.2001).

### 3. Ruling on Motion in Limine

The issue raised in Premier's cross-appeal concerns the court's in limine ruling excluding evidence of misrepresentations made by the Wisdoms in 1998 as barred by the credit agreement statute of frauds and the economic loss rule. That ruling presents only questions of law, which we review de novo. *See Jaynes, supra; The Cash Now Store, supra*, 31 P.3d at 164.

### B. W–Cattle's and the Wisdoms' Appeal

#### 1. Section 38–10–124 Applies to the Alleged Promise to Forbear

■ Defendants assert that the court erred in applying the credit agreement statute of frauds, § 38–10–124, to bar their allegation regarding statements made by Fritzler, which they characterize as a promise to forbear from declaring the loan in default. They interposed this alleged promise to for-

bear as a defense to Premier's claims, request for the appointment of a receiver, and foreclosure action, and as a basis for certain of their counterclaims and third-party claims. We are not persuaded by defendants' assertion.

### a. Premier is a "Creditor"

Under § 38–10–124(2), C.R.S.2006, "no debtor or creditor may file or maintain an action or a claim relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought."

According to the plain language of § 38–10–124(2), it applies to claims relating to credit agreements between debtors and creditors. Defendants are clearly debtors, and they do not contend otherwise. They argue, however, that Premier is not a "creditor" within the meaning of § 38–10–124. We disagree.

■ In resolving an issue of statutory interpretation, "a court's essential task is to determine and give effect to the intent of the legislature." *People v. Goodale,* 78 P.3d 1103, 1107 (Colo.2003). To accomplish this task, we must first examine the plain language of the statute itself. *People v. Dist. Court,* 713 P.2d 918, 921 (Colo.1986). If the language is clear and unambiguous, we must interpret it as written. *People v. Goodale, supra,* 78 P.3d at 1107. In addition, we must construe the statute as a whole to give consistent, harmonious, and sensible effect to all its parts. *Davison v. Indus. Claim Appeals Office,* 84 P.3d 1023, 1029 (Colo.2004).

When the General Assembly enacted § 38–10–124 in 1989, it intended "to discourage lender liability litigation and to promote certainty into credit agreements involving sums of more than $25,000." *Schoen v. Morris,* 15 P.3d 1094, 1098 (Colo.2000) (citing *Norwest Bank Lakewood, N.A. v. GCC Partnership,* 886 P.2d 299, 301 (Colo.App.1994)). "Specifically, by enacting the credit agreement statute of frauds, the legislature hoped to curtail suits against lenders based on oral representations made by members of the credit indus-

try." *Schoen, supra,* 15 P.3d at 1098. "The legislative history also indicates that the statute was intended to be broadly applied." *Schoen, supra,* 15 P.3d at 1099.

"Creditor" is defined in the statute as a "financial institution which offers to extend, is asked to extend, or extends credit under a credit agreement with a debtor." Section 38–10–124(1)(b), C.R.S.2006. The term "financial institution" is defined in § 38–10–124(1)(d), C.R.S.2006, as a "bank, savings and loan association, savings bank, industrial bank, credit union, or mortgage or finance company."

Defendants contend that Premier is not a "financial institution" because it is not one of the types of lenders enumerated. More specifically, they argue that Premier is a federal production credit association, and such associations are not included within the types of institutions listed in the definition of "financial institution" in § 38–10–124(1)(d). Premier counters that it is a "financial institution" within the meaning of the statute because it is a "bank," a "mortgage company," and a "finance company." We agree with Premier that it is a "bank" within the meaning of § 38–10–124, and therefore we need not decide whether it is also a "mortgage company" or a "finance company."

The term "bank" is not expressly defined in § 38–10–124, nor is it defined elsewhere in article 10 of title 38. We must therefore look to the statutory language, considered in context, and give the term its commonly accepted meaning. *Francis ex rel. Goodridge v. Dahl,* 107 P.3d 1171, 1176 (Colo.App.2005).

"Traditionally, banks have as their base functions the acceptance of deposits, the discounting of bills and notes, and the making of loans." *First Fiduciary Corp. v. Office of Comm'r of Banks,* 43 Mass.App.Ct. 457, 684 N.E.2d 1, 3 (1997) (citing 1 Ann Graham, *Banking Law* § 1.03 (1997)); *see also United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 326–27 n. 5, 83 S.Ct. 1715, 1721–22 n. 5, 10 L.Ed.2d 915 (1963); *Smith v. Kansas City Title & Trust Co.,* 255 U.S. 180, 210–11, 41 S.Ct. 243, 249, 65 L.Ed. 577 (1921) (concluding that Federal Land Banks are "banks"); *Warren v. Shook,* 91 U.S. 704, 710, 23 L.Ed. 421 (1875) ("Having a place of business

where deposits are received and paid out on checks, and where money is loaned upon security, is the substance of the business of a banker."); *City Nat'l Bank v. City of Beckley*, 213 W.Va. 202, 579 S.E.2d 543, 546 (2003); *Black's Law Dictionary* 154 (8th ed.2004).

Premier functions like a bank, as the term is commonly understood. It accepts deposits, allows the withdrawal of funds by check or draft, makes loans, and accepts security for the making of loans. *See* 12 U.S.C. §§ 2001(a), 2073(13), 2075, 2076a.

Defendants nevertheless argue that Premier is not a bank because Fritzler testified that Premier was not a bank, savings and loan association, savings bank, industrial bank, or credit union. However, they mischaracterize Fritzler's testimony. He testified that while Premier is not a "state-chartered bank," it is a "federally-chartered bank." As discussed above, that description is accurate. And nothing in § 38–10–124(1)(d) indicates that the term "bank" as used therein is limited to state-chartered banks.

Defendants also argue that Premier is not a bank because it does not meet the definition of that term in § 11–101–401(5), C.R.S. 2006. That section defines "bank" as:

a state bank (other than an industrial bank) or bank and trust company, chartered by this state or a national bank; except that, for the purpose of part 2 of article 104 of this title, "bank" means any bank organized or chartered under articles 10.5 and 101 to 109 of this title, any bank organized or chartered as a bank under the laws of any other jurisdiction, or any bank organized or chartered under chapter 2 of Title 12 of the United States Code. The singular "bank" includes the plural "banks."

Defendants' reliance on the definition in this provision is misplaced because the definition expressly applies only to article 101 of title 11, the Colorado Banking Code. *See* § 11–101–401, C.R.S.2006 (providing definitions for terms "[a]s used in this code"). We decline to import that definition into § 38–10–124 because there is no indication in either statute that we should do so and we are obliged to apply the credit agreement statute of frauds broadly. *Schoen, supra,* 15 P.3d at 1098.

We therefore hold that Premier is a bank within the meaning of § 38–10–124(1)(d). *Cf. Colo. Springs Production Credit Ass'n v. Farm Credit Admin.,* 967 F.2d 648, 650 (D.C.Cir.1992) (PCAs are "small, specialized banks, privately owned in cooperative form by their borrowers, that make short- and intermediate-term production loans directly to agricultural producers"). Accordingly, it is a "financial institution," and therefore a "creditor" within the meaning of § 38–10–124(1)(b).

**b. Section 38–10–124 Applies to Claims for Fraudulent Inducement**

■ Defendants contend that the court erred in concluding that the credit agreement statute of frauds applies to Fritzler's alleged promise to forbear to the extent they assert that they were "fraudulently induced" by that promise to execute the deeds of trust. According to defendants, their fraudulent inducement claim is not completely barred because they are not seeking solely to enforce a credit agreement (a claim which they concede is barred by the statute if Premier is a "creditor"), but are also seeking to rescind credit agreements (the deeds of trust) on the basis that they are void. We are not persuaded.

By its terms, the credit agreement statute of frauds precludes a debtor or creditor from "fil[ing] or maintain[ing] an action or a claim relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought." Section 38–10–124(2). As noted above, this provision must be broadly applied to give effect to its central purpose of promoting certainty in credit agreements by "curtail[ing] suits against lenders based on oral representations made by members of the credit industry." *Schoen, supra,* 15 P.3d at 1098–99.

In accordance with these principles, § 38–10–124(2) has been interpreted broadly to apply to a wide variety of claims. *See Lang*

*v. Bank of Durango,* 78 P.3d 1121, 1123–24 (Colo.App.2003) (§ 38–10–124(2) barred fraud claims seeking to void credit agreement and unjust enrichment claim); *Hewitt v. Pitkin County Bank & Trust Co.,* 931 P.2d 456, 459 (Colo.App.1995) (§ 38–10–124(2) barred all claims for breach of fiduciary duty, negligent misrepresentation, outrageous conduct, and interference with prospective business advantage); *Norwest Bank Lakewood, supra,* 886 P.2d at 301–02 (§ 38–10–124(2) barred claims for breach of fiduciary duty and negligent misrepresentation); *Pima Fin. Serv. Corp. v. Selby,* 820 P.2d 1124, 1127–28 (Colo.App.1991) (§ 38–10–124(2) barred claim of oral settlement agreement which would have substituted for credit agreement).

Contrary to defendants' assertion, it is now well established that § 38–10–124 "is not limited by its terms to contract claims or to those tort claims which seek the enforcement of a credit agreement." *Hewitt, supra,* 931 P.2d at 458. Moreover, the supreme court has held that § 38–10–124(2) " 'does not apply only to claims involving transactions that are characterized exclusively as credit agreements, but also ... to claims which merely relate to credit agreements.' " *Schoen, supra,* 15 P.3d at 1097 (quoting *Univex Int'l, Inc. v. Orix Credit Alliance, Inc.,* 914 P.2d 1355, 1358 (Colo.1996)); *see also Lang, supra,* 78 P.3d at 1123; *Hewitt, supra,* 931 P.2d at 458.

Thus, defendants' fraudulent inducement claim is barred by the statute of frauds if it is an "action or claim" relating to a covered credit agreement. Clearly, the alleged promise to forbear from declaring the loan in default—on which the fraudulent inducement claim is exclusively premised—relates to covered credit agreements, specifically the loan agreement and promissory note. Defendants do not contend otherwise. Rather, their argument appears to be that the fraudulent inducement claim is not an "action or claim" within the meaning of the statute.

As we have already noted, *Schoen, supra,* holds that a claim need not seek to enforce a promise to be barred by the statute. The issue here, therefore, is whether the phrase "action or claim" encompasses a claim of fraudulent inducement which seeks rescission of the transaction on which the creditor's claim is based. We hold that it does.

The credit agreement statute of frauds bars actions or claims "[n]otwithstanding any statutory or case law to the contrary, including but not limited to section 38–10–112 [C.R.S.2006]." Section 38–10–124(2). It also bars credit agreements allegedly implied under the circumstances by the parties' relationship or conduct. Section 38–10–124(3), C.R.S.2006. Accordingly, it is clear that the bar of § 38–10–124 applies more broadly than the bar of Colorado's general statute of frauds, § 38–10–112, in that it is not subject to the judicially created exceptions to § 38–10–112. *See Schoen, supra,* 15 P.3d at 1099 n. 3 (" '[the statute] attempts to abrogate judicially developed exceptions to the statute of frauds' " (quoting Stephanie J. Schafer, *Limiting Lender Liability Through the Statute of Frauds,* 18 Colo. Law. 1725, 1725 (1989))); *Lang, supra,* 78 P.3d at 1124 (quoting legislative history that there are to be "*no exceptions* to [§ 38–10–124] as [it applies] to $25,000 ... loan agreements and above").

In light of the purposes of the statute and its breadth, we do not perceive that an oral representation made by a member of the lending industry is excepted from the statutory bar if it is raised to avoid liability rather than to seek the recovery of damages. To hold otherwise would introduce uncertainty into credit agreements. Here, for example, defendants seek to preclude the lender from foreclosing on security on the credit agreements. Such security, however, is typically an integral part of transactions involving credit agreements.

Moreover, exempting such contentions from the statutory bar would in many cases expose lenders to greater—potentially much greater—liability on unpaid loans. In this case, for example, allowing the claim could preclude Premier from realizing the value of collateral for the loan, greatly increasing the amount of the deficiency owed by defendants, a deficiency which in all likelihood will not otherwise be satisfied.

We therefore conclude that the phrase "action or claim" in § 38–10–124(2) is not limited

to claims for affirmative recovery: it is not intended to cover only claims for relief while excluding defenses to liability based on oral representations.

In any event, allegations of fraudulent inducement fit within the commonly understood meanings of "action" and "claim." Where, as here, the party asserting fraudulent inducement seeks rescission, it is deemed to be an action on contract. *Aaberg v. H.A. Harman Co.*, 144 Colo. 579, 583, 358 P.2d 601, 603 (1960); *Wheeler v. Wilkin*, 98 Colo. 568, 570, 58 P.2d 1223, 1224 (1936). Moreover, rescission is an equitable remedy. *CAMAS Colo., Inc. v. Board of County Comm'rs*, 36 P.3d 135, 139 (Colo.App.2001). The term "claim" includes "[t]he aggregate of operative facts giving rise to a right enforceable in court" and "any right to payment *or* equitable remedy." *Black's Law Dictionary* 264 (8th ed.2004) (emphasis added).

Accordingly, the court did not err by concluding that Fritzler's alleged promise could not be asserted as a basis for rescinding the deeds of trust.

### 2. The Court Properly Refused to Apply the Thirty–Day Grace Period Provision in the Loan Agreement

■ The April 11, 2003 loan agreement contains the following provision: "If the borrowing base becomes out of compliance there will be a 30–day grace period to reestablish compliance. If the base is not in compliance after 30 days, no more cattle will be purchased until the base meets the 25% liquid margin requirement." Defendants argue that the court should have denied the motions for summary judgment, discharged the receiver, and dismissed the foreclosure because Premier failed to comply with this provision. We disagree.

Before ruling on defendant's motion to discharge the receiver and motion to dismiss the foreclosure action, the court heard testimony and received documentary evidence on the issue of defendants' defaults. The court concluded that they had defaulted on the loan in at least seven different ways: (1) by using loan proceeds for purposes other than purchasing cattle and feed and paying operating expenses; (2) by misrepresenting the use of the funds for capital purchases; (3) by misrepresenting the number of cattle and the amount of grain purchased; (4) by misrepresenting W–Cattle's financial condition; (4) by W–Cattle's inability to pay the loan; (5) by the material deterioration of the feedlot's financial position; (6) by being insolvent; and (7) by leading Premier to the reasonable belief that the loan was not adequately secured. The court also found that several of these defaults, including the misrepresentations to Premier concerning W–Cattle's financial position, and the misuse of loan proceeds, were of a longstanding and continual nature, could not be cured, and constituted substantial and material breaches of the loan agreement.

The court also reasoned that the thirty-day grace period provision in the April 11, 2003 loan agreement only applied to defaults that have some logical possibility of being cured. Because the court determined that at least some of the defaults could not be cured, the court concluded that Premier's failure to provide a thirty-day grace period within which to cure the defaults did not bar Premier's suit. To hold otherwise, the court reasoned, would lead to an absurd result.

Defendants attack the court's findings initially by contending that all the defaults the court found relate to the insufficiency of the value of the collateral, and were therefore subject to the grace period provision. That is plainly not the case, however. Many arise from false representations, often repeated over long periods. Others pertain to misuse of loan proceeds. Defendants do not challenge these findings, all of which are amply supported by the record. Thus, we see no basis to disturb those findings on appeal. *See Town of Breckenridge v. Golforce, Inc.*, 851 P.2d 214, 216 (Colo.App.1992) (whether contract has been breached is an issue of fact, and fact finder's verdict will be upheld if there is evidence in the record to support it).

Defendants also argue that the plain language of the grace period provision dictates that it applies in the event of any default, or, alternatively, if any event of default pertains to the value of the collateral vis-a-vis the loan

balance. We find this argument entirely unpersuasive.

 The interpretation of a contract is a question of law, which we review de novo. *Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo.1990). When interpreting a contract, our task is to give effect to the intent of the parties. *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo.2000). "The intent of the parties to a contract is to be determined primarily from the language of the instrument itself." *Ad Two, supra*, 9 P.3d at 376. That "language must be examined and construed in harmony with the plain and generally accepted meaning of the words used, and reference must be made to all the agreement's provisions." *Fibreglas Fabricators, Inc., supra*, 799 P.2d at 374.

By its express terms, the grace period provision applies in the event that "the borrowing base becomes out of compliance." The next sentence states that the borrowing base is in compliance if the twenty-five percent liquid margin is restored. Thus, read in context, the grace period provision applies only to those defaults pertaining to the twenty-five percent margin. As noted above, the record supports the court's findings that there were other events of default, which are not subject to the grace period provision.

 When several documents are part of a single transaction, they should be read together as a whole, not in isolation, to determine the parties' intent, even if the documents do not refer to one another. *In re Water Rights of Town of Estes Park*, 677 P.2d 320, 327 (Colo.1984).

Here, the transaction consisted not only of the additional terms cited by defendants, but also of a note, a security agreement, and the remainder of the loan agreement. In addition, the addendum to the security agreement and the deeds of trust became part of the parties' overall agreement. The note, security agreement, and deeds of trust all contain default provisions describing various events of default thereunder, most of which are unrelated to the borrowing base requirement. Further, the note and deeds of trust give Premier the right to declare the indebtedness "immediately" due and payable upon default, without notice or demand to defendants.

Defendants nevertheless argue that the other default provisions in the loan documents are inconsistent with the grace period provision, and that the grace period provision should prevail because it is typed rather than printed, like the remainder of the loan documents. *See Hyland Hills Metro. Park & Recreational Dist. v. McCoy Enterprises*, 38 Colo.App. 23, 26, 554 P.2d 708, 710 (1976) (holding that if various provisions cannot be reconciled, the typed provisions prevail over the printed provisions). There is no inconsistency here, however, because the grace period provision only applies to defaults related to the twenty-five percent liquid collateral margin requirement. No other defaults are subject to that provision.

Accordingly, the grace period provision did not bar Premier's suit on the note and deeds of trust.

### 3. The Court Did Not Err in Applying the Restructure Provision of the Farm Credit Act

 Defendants claim that the court erred by refusing to apply the restructure provision of the FCA, 12 U.S.C. § 2202a(b), to bar Premier's request for appointment of a receiver, its request for replevin of the personal property collateral, its action on the note, and its C.R.C.P. 120 foreclosure. According to defendants, Premier's failure to give them an opportunity to restructure the loan before filing suit forfeited its remedies under the loan documents. We disagree.

12 U.S.C. § 2202a(b) provides:

(1) In general[.] On a determination by a qualified lender that a loan made by the lender is or has become a distressed loan, the lender shall provide written notice to the borrower that the loan may be suitable for restructuring, and include with such notice—

(A) a copy of the policy of the lender established under subsection (g) of this section that governs the treatment of distressed loans; and

(B) all materials necessary to enable the borrower to submit an application for restructuring on the loan.

(2) Notice before foreclosure[.] Not later than 45 days before any qualified lender begins foreclosure proceedings with respect to a loan outstanding to any borrower, the lender shall notify the borrower that the loan may be suitable for restructuring and that the lender will review any such suitable loan for restructuring, and shall include with such notice a copy of the policy and the materials described in paragraph (1).

(3) Limitation on foreclosure[.] No qualified lender may foreclose or continue any foreclosure proceeding with respect to any distressed loan before the lender has completed any pending consideration of the loan for restructuring under this section.

Thus, § 2202a(b) establishes a process whereby a lender must give a borrower forty-five days notice of the borrower's right to seek restructuring of the distressed loan before commencing foreclosure proceedings. If the borrower submits a restructuring application within that period, a foreclosure may not be initiated or pursued while the lender is considering that application in accordance with its policies.

Premier conceded that it failed to give defendants the notice under § 2202a(b)(2) before filing the foreclosure action. It argued, however, that 12 U.S.C. § 2202a(j), the statutory exception to the notice requirement, applied. 12 U.S.C. § 2202a(j) provides:

> This section shall not be construed to prevent any qualified lender from enforcing any contractual provision that allows the lender to foreclose a loan, or from taking such other lawful action as the lender deems appropriate, if the lender has reasonable grounds to believe that the loan collateral will be destroyed, dissipated, consumed, concealed, or permanently removed from the State in which the collateral is located.

After hearing extensive testimony, and receiving a great deal of documentary evidence, the court concluded that Premier had reasonable grounds to believe that the personal property collateral could be dissipated, and that the exception to the notice requirement therefore applied to the collateral. The court also concluded, however, that there was no such danger with respect to the real property. Accordingly, the court found that the exception did not apply to the real property, and required Premier to give notice pursuant to 12 U.S.C. § 2202a(b) prior to continuing with the foreclosure on the real estate. The court therefore stayed the foreclosure to allow defendants time to submit a restructuring plan to Premier, and to give Premier time to consider it.

Defendants argue that the exception does not apply to any of the collateral, and that the court's finding to the contrary is not supported by any evidence in the record. They claim there was no evidence presented to show that the personal property collateral was in danger of being depleted. However, the record amply supports the court's finding in this context that "there has been an unexplained loss of thousands of head of cattle." The record also supports the court's conclusion that the Wisdoms had failed to provide any credible explanation for the missing collateral. Further, the record contains evidence that the collateral base had deteriorated materially over time, including the disappearance of machinery and equipment, and that as of November 6, 2003, W–Cattle had less than one month's supply of feed on hand. Therefore, we may not disturb the court's findings on appeal. *Coors, supra*, 112 P.3d at 64.

Defendants also argue that the remedy applied by the court vis-à-vis the real estate foreclosure conflicts with the FCA restructure provision. They contend that compliance with 12 U.S.C. § 2202a(b) is essentially a condition precedent to any action against them pertaining to the loan, so that the cases should have been dismissed. Defendants misconstrue the statute.

Violations of 12 U.S.C. § 2202a(b) do not require dismissal of the underlying foreclosure action. *See Farm Credit Bank of Spokane v. Fauth*, 251 Mont. 101, 822 P.2d 650, 652 (1991) (holding that 12 U.S.C. § 2202a(b) "is a limitation on the enforcement of foreclo-

sure rather than a condition precedent to filing a foreclosure action"). Moreover, contrary to defendants' suggestion, there is no private right of action to affirmatively enforce the FCA. *Federal Land Bank of Spokane v. L.R. Ranch Co.*, 926 F.2d 859, 862–63 (9th Cir.1991) (citing *Harper v. Federal Land Bank of Spokane*, 878 F.2d 1172 (9th Cir.1989)); *Zajac v. Federal Land Bank of St. Paul*, 909 F.2d 1181, 1182–83 (8th Cir. 1990) (en banc); *Bowling v. Block*, 785 F.2d 556, 557 (6th Cir.1986); *Smith v. Russellville Production Credit Ass'n*, 777 F.2d 1544, 1546–48 (11th Cir.1985); *Grant v. Farm Credit Bank of Texas*, 841 F.Supp. 186, 189 (W.D.La.1992), *aff'd*, 8 F.3d 295 (5th Cir. 1993); *Williams v. Federal Land Bank of Jackson*, 729 F.Supp. 1387, 1389 (D.D.C. 1990), *aff'd*, 954 F.2d 774 (D.C.Cir.1992); *Kolb v. Naylor*, 658 F.Supp. 520, 525 (N.D.Iowa 1987). In fact, it has been held that the language of § 2202a(b) provides no remedies whatsoever for enforcement of its provisions in a state foreclosure proceeding. *See L.R. Ranch Co., supra*, 926 F.2d at 863; *Speck v. Federal Land Bank of Omaha*, 494 N.W.2d 628, 632 (S.D.1993). There is certainly nothing in the FCA indicating that a failure to comply with the restructuring provision before filing suit works a forfeiture of a lender's rights. As the district court noted, any such failure does not cure defaults, nor does it restore the loan to "current" status.

Likewise, nothing in the FCA precludes staying the foreclosure. To the contrary, § 2202a(b)(3) implicitly permits (but does not require) the court's choice of remedy, because it states that a lender may not "continue a foreclosure proceeding" before the lender has considered a restructuring application. *See Burgmeier v. Farm Credit Bank of St. Paul*, 499 N.W.2d 43, 50 (Minn.Ct.App.1993) ("Under section 2202a(b), a state foreclosure proceeding is tolled until a borrower receives notice of the right to file an application for restructuring."). The court's stay order abated the foreclosure action pending Premier's consideration of the restructuring application.

Defendants argue, however, that the court's appointment of a receiver rendered the statutory restructuring provision useless because restructuring was not possible after the receiver had seized all their property. This argument, however, is a bare assertion of counsel, unsupported by citations to evidence in the record. Accordingly, we see no basis for overturning the district court's resolution of this issue.

### 4. The Court Properly Rejected Defendants' Remaining Defenses

Defendants contend that the court erred in denying their motion to discharge the receiver and in authorizing the continuation of the foreclosure for two additional reasons: (1) because Premier's "unclean hands" barred the appointment of the receiver as to the real estate; and (2) because the deeds of trust were void for lack of consideration. In addition, they contend that the court erred in rejecting their other defenses of duress and equitable estoppel. We disagree.

#### a. Unclean Hands

The appointment of a receiver is governed by general equitable principles. *Johnson v. El Paso Cattle Co.*, 725 P.2d 1180, 1182 (Colo.App.1986) (citing *Melville, supra*, 106 Colo. at 125, 103 P.2d at 9). A party requesting equitable relief from the courts must do so with "clean hands." *Salzman v. Bachrach*, 996 P.2d 1263, 1269 (Colo.2000) (citing 1 Dan B. Dobbs, *Law of Remedies* § 2.4(2) (2d ed.1993)). Thus, a party engaging in improper or fraudulent conduct relating in some significant way to the subject matter of the cause of action may be ineligible for equitable relief. *Salzman, supra*, 996 P.2d at 1269 (citing *Rhine v. Terry*, 111 Colo. 506, 508, 143 P.2d 684, 684 (1943)). "The [unclean hands doctrine] is intended to protect the integrity of the court, and simply means that equity refuses to lend its aid to a party who has been guilty of unconscionable conduct in the subject matter in litigation." *Jameson v. Foster*, 646 P.2d 955, 958 (Colo. App.1982); *see also Salzman, supra*, 996 P.2d at 1269 (citing *Rhine, supra*, 111 Colo. at 508, 143 P.2d at 685).

Defendants assert that because the district court found "some evidence" of Fritzler's alleged promise to forbear, it erred in

rejecting the "unclean hands" defense. We disagree.

 Whether the clean hands doctrine applies in a given case is a question of fact. *McCann v. Jackson,* 163 Colo. 163, 165–66, 429 P.2d 265, 266 (1967). Because equitable matters such as this are entirely discretionary, it is within the trial court's discretion to determine not only whether the facts support a finding of unclean hands, but also whether to grant equitable relief based on such a finding. Further, when determining whether the appointment of a receiver is proper, the court should consider the totality of the circumstances. *See State ex rel. Celebrezze v. Gibbs,* 60 Ohio St.3d 69, 573 N.E.2d 62, 67 n. 3 (1991).

Here, the court considered all defendants' allegations, but nevertheless concluded that the appointment of the receiver was necessary under all the circumstances. Those circumstances included the long history of misrepresentations by defendants (misrepresentations that the court found to be of a serious and continuing nature), the collateral value was far below both the balance of the loan and what the Wisdoms represented it to be in their financial statements and borrowing base reports, and the Wisdoms' failure to provide any credible explanation for the misrepresentations or the dissipation of the collateral base.

As discussed above, the record supports the court's findings. Thus, given the totality of the circumstances, the court did not abuse its discretion in denying defendants' motion to discharge the receiver based on their unclean hands defense.

### b. Lack of Consideration

 The Wisdoms argue that the November 2003 deeds of trust are void for lack of consideration because they received nothing in return for signing them. We disagree, and conclude that good and valuable consideration supported the deeds of trust.

 When an obligor signs a note and deed of trust, there is a presumption that the agreements are supported by valid consideration. *Grant v. Oten,* 626 P.2d 764, 766 (Colo. App.1981). This presumption may be rebutted, however, upon a showing by the obligor of the absence of consideration. *Grant, supra,* 626 P.2d at 766. Once the obligor presents evidence tending to prove a lack of consideration, whether valid consideration existed becomes a question of fact. *Grant, supra,* 626 P.2d at 766. If the court's findings regarding the existence of consideration are supported by the record, we will not disturb them on appeal. *Grant, supra,* 626 P.2d at 766.

Defendants' antecedent debt to Premier (the April 11, 2003 promissory note) served as valid consideration for the November 2003 deeds of trust. *Jerome v. Carbonate Nat'l Bank,* 22 Colo. 37, 40, 43 P. 215, 216 (1895); *Knox v. McFarran,* 4 Colo. 586, 596 (1879); *Beaman v. Stewart,* 19 Colo.App. 226, 230, 74 P. 344, 345 (1903); *Sargent v. Chapman,* 12 Colo.App. 529, 56 P. 194 (1899); *Tennis v. Barnes,* 11 Colo.App. 196, 198–99, 52 P. 1038, 1039–40 (1898); *cf.* § 4–3–303(a)(3), C.R.S. 2006 (instrument is transferred for value if it is transferred as security for an antecedent claim); § 38–8–104(1), C.R.S.2006 (value is given for a transfer if it secures an antecedent debt).

Defendants' reliance on *Reid, Murdoch & Co. v. Bird,* 15 Colo.App. 116, 61 P. 353 (1900), is misplaced. There, the court explicitly recognized the rule recited above, but noted that it is limited to cases where there has been "an actual transfer of the title, or a turning over of the property in payment *or as a security." Reid, Murdoch & Co., supra,* 15 Colo.App. at 122, 61 P. at 355 (emphasis added). Here, the deeds of trust were pledged as security. Moreover, the court in *Reid, Murdoch & Co.* merely held that a third-party creditor may set aside a transfer of property from a debtor to another creditor where the third-party creditor is seeking to rescind its sale of that property to the debtor on the grounds of fraud, notwithstanding that the property is purportedly given to the other creditor for an antecedent debt. *See also In re J.S. Appel Suit & Cloak Co.,* 198 F. 322, 324–25 (D.Colo.1912) (applying Colorado law); *Nicholls v. McShane,* 16 Colo. App. 165, 168–69, 64 P. 375, 376 (1901). That is simply not the situation in this case.

#### c. Duress

Defendants argue that the court erred in rejecting their defense of duress in relation to their execution of the April 11, 2003 loan documents. They claim that because of their financial situation at the time, they had no choice but to sign the loan agreement, promissory note, and security agreement. We disagree.

"A contract is voidable on the grounds of duress if a party's manifestation of assent is induced by an improper threat that leaves no reasonable alternative." *Vail/Arrowhead, Inc. v. Dist. Court,* 954 P.2d 608, 612 (Colo.1998).

"To establish duress as ground[s] for the avoidance of a contract, conveyance, or other act, it is not alone sufficient to show the exertion of pressure by threats or even by physical compulsion, but it must also clearly appear that the force or threats employed actually subjugated the mind and will of the person against whom they were directed, and were thus the sole and efficient cause of the action which he took."

*Wiesen v. Short,* 43 Colo.App. 374, 376, 604 P.2d 1191, 1192 (1979) (quoting *Hastain v. Greenbaum,* 205 Kan. 475, 470 P.2d 741 (1970)). The existence of duress is ordinarily a question of fact. *See People v. Y.D.M.,* 197 Colo. 403, 410, 593 P.2d 1356, 1361 (1979).

Defendants argue that because the existence of duress is a question of fact, summary judgment was improper. Not every argument relating to an issue of fact, however, presents a genuine issue of material fact for trial. *See, e.g., Burman v. Richmond Homes Ltd.,* 821 P.2d 913, 920 (Colo.App. 1991). Where the moving party establishes that the facts alleged by the nonmoving party are legally insufficient to support the nonmoving party's claim, whether because they lack any admissible evidentiary support or because those facts are not material to the ultimate issue, summary judgment is not barred merely because the theory advanced by the nonmoving party is one that is typically regarded as one of fact.

The court found that the Wisdoms had made "no showing whatsoever" that their will had been overborne. We agree.

The Wisdoms have not expressly identified any threat by Premier. Apparently, the "threat" on which they rely is the implied one that Premier would call the loan due if they did not renew it. Premier, however, would have had the legal right to call the loan due, and so any such "threat" is not cognizable as duress as a matter of law. *See Walker v. Dearing,* 100 Colo. 28, 32, 63 P.2d 513, 514–15 (1937); *Heald v. Crump,* 73 Colo. 251, 252–53, 215 P. 140, 141 (1923); *Cooper v. Flagstaff Realty,* 634 P.2d 1013, 1015 (Colo. App.1981).

Moreover, the financial bind in which defendants found themselves—which was one of their creation, not Premier's—does not constitute duress because they were not without alternatives. *See Vail/Arrowhead, supra,* 954 P.2d at 613 (the threat of commencing a civil action to enforce a monetary claim is not duress "because the victim's ability to assert his or her rights in the threatened action is a reasonable alternative to succumbing to the threat and then later filing suit"); *cf. Wann v. Coe,* 31 F. 369, 371 (D.Colo.1887) (no duress where borrower of large sum of money was compelled by his financial situation to agree to pay a higher interest rate); *Heald, supra,* 73 Colo. at 252–53, 215 P. at 141 (no duress where borrower was allegedly induced into executing renewal note by lender's statement that it would sell collateral security); *Cooper, supra,* 634 P.2d at 1015 (no duress where note and deed of trust executed to obtain release of lis pendens); *Wiesen, supra,* 43 Colo.App. at 376, 604 P.2d at 1192 (no duress where borrower executed note as condition of lender's agreement not to force borrower's brother into bankruptcy, and to avoid harmful effects on borrower's business).

Thus, Premier established the lack of any genuine issue of material fact and its entitlement to judgment as a matter of law on the duress defense.

#### d. Equitable Estoppel

The Wisdoms contend that their defense of equitable estoppel presented genuine issues of material fact. This defense was based on their allegation that Fritzler made

an oral promise to forbear to them on November 7, 2003, which induced them to sign the deeds of trust.

We have already held that evidence of this promise to forbear is barred by the credit agreement statute of frauds, § 38–10–124. The Wisdoms, however, cite *Crown Life Insurance Co. v. Haag Limited Partnership*, 929 P.2d 42 (Colo.App.1996), for the proposition that equitable estoppel may be asserted as a defense notwithstanding § 38–10–124. *Crown Life* does not so hold. The equitable estoppel defense in that case was based on the implied covenant of good faith and fair dealing, and the defense was rejected on the basis that the borrowers had not asserted facts which, if proved, would establish an estoppel. The credit agreement statute of frauds was not discussed in the context of this defense.

Section 38–10–124(3), C.R.S.2006, expressly provides that "[a] credit agreement may not be implied under any circumstances, including ... by promissory estoppel." Section 38–10–124(2) further states that oral credit agreements are unenforceable "[n]otwithstanding any statutory or case law to the contrary." Given that we must construe § 38–10–124 broadly to effectuate its purposes, we see no basis for distinguishing between promissory estoppel and equitable estoppel in this context, particularly in light of the nature of the promise alleged.

Finally, even if we were to conclude that § 38–10–124 does not bar the Wisdoms' equitable estoppel defense, we would agree with the district court that the statements allegedly made by Fritzler were simply too vague to create any legal impediment to Premier's pursuit of its remedies. One of the elements of equitable estoppel is reasonable reliance on the representation on which the defense is based. *Thurman v. Tafoya*, 895 P.2d 1050, 1058 (Colo.1995). "A party ... may not rely on the mere noncommittal acts of another in order to establish equitable estoppel." *Thurman, supra*, 895 P.2d at 1058; *see also Mountainwood Condo. Homeowners Ass'n v. Cal–Colorado*, 765 P.2d 1066, 1069 (Colo.App. 1988). Fritzler's alleged statements are noncommittal, whether considered in isolation or in the context of the parties' dealings. *Cf.*

*Bridges v. Reliance Trust Co.*, 205 Ga.App. 400, 422 S.E.2d 277, 279–80 (1992) (statement that "something will be worked out" too indefinite to constitute an enforceable agreement); *Ames v. Sundance State Bank*, 850 P.2d 607, 610 (Wyo.1993) (promises to "stick with" or "fund [borrower's] operation" too vague to support promissory estoppel or breach of contract claims).

### 5. Defendants' Remaining Arguments Pertaining to Their Counterclaims and Third–Party Claims Fail

Defendants challenge the summary judgment in favor of Premier and Fritzler on their counterclaims and third-party claims for fraud, negligence, and breach of fiduciary duty on a variety of grounds not addressed above. We reject each of those contentions.

#### a. Fraud

Defendants contend that the district court erred in dismissing their fraud claim against Premier and Fritzler because Fritzler's alleged promise, on which the claim is based, is "premised both on the theory of active misrepresentation and on the theory of concealment." We fail to see the relevance of any such distinction in this context. We have already concluded that § 38–10–124(2) bars any claims arising from the alleged promise to forbear. Dismissal of that claim was appropriate pursuant to § 38–10–124(2) regardless of the precise nature of the fraudulent conduct asserted by defendants. *See Lang, supra*, 78 P.3d at 1123–24 (§ 38–10–124(2) barred fraud claims relating to the credit agreement).

#### b. Negligence

Defendants argue that the court erred in dismissing their negligence claim against Premier and Fritzler, to the extent it is based on Premier's alleged failure to maintain cattle and feed inventories, as barred by the economic loss rule. They contend that the economic loss rule does not bar their negligence claim because it only bars such claims where there is a corresponding contractual duty and a breach thereof, and here, the court found that there was no contractual

duty on Premier's part to maintain cattle and feed inventory records.

The negligence claim falters at the outset, however, because defendants cite no authority for the proposition that Premier had any such duty arising from any source. It is axiomatic that a negligence claim cannot be maintained in the absence of a legal duty. *Ryder v. Mitchell*, 54 P.3d 885, 889 (Colo. 2002); *Univ. of Denver v. Whitlock*, 744 P.2d 54, 56 (Colo.1987). As defendants have not established any legal basis for the duty they assert, their negligence claim must fail regardless of whether the economic loss rule might have any application in these circumstances. Accordingly, the district court did not err in granting summary judgment in Premier's and Fritzler's favor on this claim.

### C. Breach of Fiduciary Duty

 Finally, defendants contend that the court erred in dismissing their claim against Premier and Fritzler for breach of fiduciary duty. As pleaded, this claim, like the negligence claim, seeks recovery for Premier's alleged failure to maintain cattle and feed inventory records. We agree with the court that defendants failed to establish that they had a fiduciary relationship with Premier as a matter of law.

 In the absence of special circumstances, the relationship between a lending institution and its customer is merely one of creditor and debtor. *Rivera v. Central Bank & Trust Co.*, 155 Colo. 383, 385–86, 395 P.2d 11, 13 (1964); *Rubenstein v. South Denver Nat'l Bank*, 762 P.2d 755, 756 (Colo.App. 1988).

Here, defendants allege only that their relationship with Premier was a long one; that they were dependent on the annual renewals of the line of credit; and that they are not merely borrowers visàvis Premier, they are also "member/ owners." With the exception of the fact of membership in Premier, these allegations relate only to activities taken in the normal course of a lender-borrower relationship. *See Torke v. Federal Deposit Ins. Corp.*, 761 F.Supp. 754, 757 (D.Colo.1991).

Other courts have rejected similar contentions by members of production credit associations that such facts establish a fiduciary relationship. *See, e.g., Mantooth v. Federal Land Bank of Louisville*, 528 N.E.2d 1132, 1138–39 (Ind.Ct.App.1988); *Burgmeier, supra*, 499 N.W.2d at 51; *Yoest v. Farm Credit Bank of St. Louis*, 832 S.W.2d 325, 328–29 (Mo.Ct.App.1992); *Production Credit Ass'n of Fargo v. Ista*, 451 N.W.2d 118, 12021 (N.D.1990); *Production Credit Ass'n of Lancaster v. Croft*, 143 Wis.2d 746, 423 N.W.2d 544, 547–48 (Ct.App.1988). We agree with those determinations. Accordingly, we conclude that the court properly entered summary judgment in Premier's and Fritzler's favor on this claim to the extent it is based on either Premier's alleged failure to maintain cattle and feed inventory records or Fritzler's alleged promise to forbear.

### C. Premier's Cross–Appeal

The district court dismissed Premier's fraud claims based on its conclusions, made in the context of ruling on defendants' motion in limine, that those claims were barred by the credit agreement statute of frauds and the economic loss rule. In its brief, Premier states that if we hold that the credit agreement statute of frauds applies to dealings between it and defendants, it does not challenge the court's ruling on that issue. Because we have so held, we accept Premier's concession, and affirm the district court's judgment against Premier on its fraud claims. Premier's challenge to the district court's ruling based on application of the economic loss rule is therefore moot.

### III. Conclusion

The judgments and orders of the district court are affirmed.

CASEBOLT, J., concurs.

CARPARELLI, J., specially concurs.

Judge CARPARELLI specially concurring.

I concur in the majority opinion except with regard to the conclusion that § 38–10–124(2), C.R.S.2006, bars a party from defending against enforcement of a credit agree-

ment on grounds of fraudulent inducement. My concern is that the majority's interpretation protects those who fraudulently induce another to sign a written credit agreement. *Cf. Burnford v. Blanning,* 189 Colo. 292, 540 P.2d 337 (1975). This is contrary to the words and the purpose of the statute. Nonetheless, I concur in the result because Premier was entitled to judgment as a matter of law regarding the defense of fraudulent inducement.

## I. Pertinent Facts

Premier sued for breach of a promissory note and also stated a claim for replevin based on deeds of trust and security agreements. Defendants filed counterclaims, including one for fraud, alleging they would not have signed the deeds of trust and security agreements but for false representations by Premier. Defendants also listed affirmative defenses, including estoppel and fraud.

Defendant Ronny Wisdom testified that, seven months after defendants signed the promissory note, he met with Melvin Fritzler, Premier's president, and discussed the discrepancy in the number of cattle. Wisdom testified that he and his son suggested giving Premier a deed of trust, and that he said, "I don't want a fight. Let's work this out." According to Wisdom, Fritzler was angry and responded, "Well, if you don't, we're going to have a fight." Wisdom stated that he thought about the situation that night, thought he might be able to explain the cause of the discrepancy, called the proprietors of the lot at which some of the cattle were located, and arranged for them to accompany him to a meeting with Fritzler the next day. Wisdom said he went into the meeting with Fritzler with the intention of explaining the discrepancy, but that Fritzler said, "We're not going to worry about cattle. We're not going to worry about the past. We're going to go forward from here."

Based on this testimony, defendants asserted that they believed Premier was going to forbear from pursuing an action for breach of the note, and would continue the lending relationship. They contended that they executed the documents in reliance on that be-

lief. However, Premier promptly initiated a foreclosure action.

Defendants argued that Premier fraudulently concealed the fact that it intended to foreclose immediately. They did not allege that Premier fraudulently induced them to sign the underlying promissory note.

In May 2004, the court concluded that the deeds of trust were properly granted. In its order, the court addressed Wisdom's testimony regarding Fritzler's alleged statement that Premier would not worry about what had happened in the past with the cattle and that the parties would move forward. The court found that the meaning of the comments was not clear and that it was not clear what remedy such comments would afford defendants.

In December 2004, the court granted Premier's motion for summary judgment as to its claim for breach of the promissory note. Among other things, the court concluded, as a matter of law, that Fritzler's statements to Wisdom were too vague to imply an agreement to forbear with regard to enforcement of the note.

Defendants now argue that Premier's alleged fraudulent inducement vitiates the deeds of trust and security agreements and makes them voidable. Defendants state that they are not seeking to enforce Premier's alleged promise to forbear from pursing an action for breach of the promissory note, but rather seek to void the deeds of trust and security agreements. Premier contends, and the majority concludes, that § 38–10–124, C.R.S.2006, bars defendants from asserting fraudulent inducement as a defense to the validity of the agreements.

I conclude that the district court correctly did not rescind the deeds of trust and security agreements based on the defense of fraudulent inducement.

## II. Statutory Interpretation

We interpret statutes in a manner that gives effect to the General Assembly's intent. To do this, we begin with the language of the statute, giving words their plain and ordinary meaning. *Carlson v. Ferris,* 85 P.3d 504 (Colo.2003). When the plain language of a

statute is free from ambiguity, other rules of statutory construction are unnecessary. *Kinder v. Indus. Claim Appeals Office*, 976 P.2d 295 (Colo.App.1998); *Spanish Peaks Mental Health Ctr. v. Huffaker*, 928 P.2d 741 (Colo.App.1996). The court should only resort to extraneous evidence for clarification when an uncertainty exists. *McNichols v. City & County of Denver*, 120 Colo. 380, 209 P.2d 910 (1949).

In addition, "[s]tatutes in derogation of the common law must be strictly construed, so that if the legislature wishes to abrogate rights that would otherwise be available under the common law, it must manifest its intent either expressly or by clear implication." *Vigil v. Franklin*, 103 P.3d 322, 327 (Colo.2004) (quoting *Vaughan v. McMinn*, 945 P.2d 404, 408 (Colo.1997), and *Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1076 (Colo.1992)). "[W]hen the legislature speaks with exactitude, we must construe the statute to mean that the inclusion or specification of a particular set of conditions necessarily excludes others." *Vigil v. Franklin*, *supra*, 103 P.3d at 327 (quoting *Lunsford v. W. States Life Ins.*, 908 P.2d 79, 84 (Colo.1995)).

### III. Fraudulent Inducement as a Common Law Defense

"Fraudulent inducement is an elementary concept in the law of contracts, and is intended to shield a party from liability in a contract action only when another party has procured the alleged contract wrongfully." *Lyn–Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 289–90 (5th Cir.2002).

> When one pleads that he or she entered into a contract as a result of the fraud of another, the plea goes to the fundamental issue in contract actions, whether there is an enforceable agreement. One who has been fraudulently induced to enter into a contract has not assented to the agreement since the fraudulent conduct precludes the requisite mutual assent.

Samuel Williston, *A Treatise on the Law of Contracts* § 69:1, at 486 (4th ed.2003).

A defendant may be granted rescission of a contract if (1) the plaintiff concealed a past or present fact, failed to disclose a past or present fact that the plaintiff had a duty to disclose, or made a false representation of a past or present fact; (2) the fact was material; (3) the defendant entered into the alleged contract relying on the assumption that the concealed or undisclosed fact did not exist or was different from what it actually was, or that the falsely stated fact was true; (4) the defendant's reliance was justified; and (5) the defendant has returned or offered to return to the plaintiff anything the retention of which would unjustly enrich the defendant. *See Stoner v. Marshall*, 145 Colo. 352, 355, 358 P.2d 1021, 1022–23 (1961); *Aaberg v. H.A. Harman Co.*, 144 Colo. 579, 358 P.2d 601 (1961) (plaintiff who is fraudulently induced may affirm the contract and *sue* for damages in tort, or to rescind the contract and *sue* in contract under theory of assumpsit); *Tisdel v. Cent. Sav. Bank & Trust Co.*, 90 Colo. 114, 130, 6 P.2d 912, 917 (1931); CJI–Civ. 30:18.

### IV. Statute of Frauds

The Colorado's statute of frauds requires certain agreements to be in writing and, in general, states that, absent a writing, such agreements are void. *See, e.g.*, §§ 38–10–101, 38–10–103, 38–10–108, 38–10–111 to –112, 38–10–114, 38–10–117 to –121, C.R.S. 2006. Thus, the statute of frauds does not provide the basis for a claim, but a defense against a claim seeking enforcement of an oral agreement. In addition, the statute does not state that all writings that purport to be contracts are, in fact, valid and binding contracts. "A contract may contain all of the essential elements required for enforceability, and, if within the Statute of Frauds, may be in the form that the law requires, but may nonetheless be unenforceable as a result of the imposition of an affirmative defense." Williston, *supra*, § 69:1, at 485.

### V. Section 38–10–124(2)

Section 38–10–124(2) provides as follows:

> Notwithstanding any statutory or case law to the contrary, including but not limited to section 38–10–112, no debtor or creditor may file or maintain an action or a claim relating to a credit agreement involving a

principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought.

Under the definition of credit agreement in § 38–10–124(1)(a), a party may bind another based on one of the following circumstances only if it is in writing: (1) a promise or offer to forbear repayment of money; (2) an agreement to amend, cancel, waive, or substitute terms or provisions of any credit agreement; and (3) any representation or omission made in connection with the negotiation of any credit agreement.

## A. Provision Bars Claims, Not Defenses

Section 38–10–124(2) explicitly prohibits *enforcement of credit agreements* that are not in writing. *Webster's Third New International Dictionary* 751 (1986) defines "enforcement" as the act of enforcing, as compulsion, and as compelling fulfillment. Similarly, *Black's Law Dictionary* 549 (7th ed.1999) defines "enforcement" to mean "the act or process of compelling compliance with a law, mandate, or command."

Thus, the statute's use of the word enforcement and the phrase "the party sought to be held liable under the agreement" unambiguously refer to actions and claims seeking to hold another liable, and not to the application of legal or equitable principles negating the existence of a binding contract. This conclusion is further supported by the statute's requirement that the writing be signed by the party against whom enforcement is sought.

The cases cited by the majority do not hold otherwise because they all address whether § 38–10–124(2) bars claims for relief that sought to make lenders liable either in contract, quasi contract, or tort. They do not address whether the statute bars defenses to the existence of a contract or the enforceability of a written agreement. *See Schoen v. Morris,* 15 P.3d 1094 (Colo.2000); *Lang v. Bank of Durango,* 78 P.3d 1121 (Colo.App. 2003); *Hewitt v. Pitkin County Bank & Trust Co.,* 931 P.2d 456 (Colo.App.1995); *Norwest Bank Lakewood v. GCC P'ship,* 886 P.2d 299 (Colo.App.1994); *Pima Fin. Serv.*

*Corp. v. Selby,* 820 P.2d 1124 (Colo.App. 1991).

Consequently, unlike the majority, I cannot conclude that the plain and ordinary meaning of the phrase "may file or maintain an action or a claim," is that, when there is a writing, a defendant against whom enforcement is sought may not present *defenses* to the validity of the alleged contract, including those based on oral fraudulent inducement.

Giving the words of the statute their plain and ordinary meaning, this provision only prohibits the enforcement of an oral credit agreement involving a principal amount in excess of $25,000, and prohibits the enforcement of a written credit agreement unless it is signed by the party sought to be held liable under the agreement.

## B. Common Law Defenses Not Abrogated

Because the provision only prohibits the enforcement of oral credit agreements involving a principal amount in excess of $25,000, and written agreements not signed by the party to be held liable, the phrase, "[n]otwithstanding any statutory or case law to the contrary," means only that any other statutory or case law that would permit the enforcement of oral or unsigned agreements is without force or effect. The phrase does not clearly or explicitly abrogate common law defenses to the validity of contracts.

Section 38–10–124(3), C.R.S.2006, is consistent with this conclusion. It states that the existence of an agreement may not be implied from, among other things, the relationship of the parties, fiduciary or otherwise, from performance or partial performance, or by a quasi contract claim of promissory estoppel. It does not say that all written agreements are presumed valid, or that all written agreements may be enforced notwithstanding fraudulent circumstances attending their execution.

## C. Purpose–Based Interpretation

Because the plain language of the statute is free from ambiguity, other rules of statutory construction are unnecessary, and resort to extraneous evidence for clarification is inappropriate. Nonetheless, a purpose-based,

rather than a text-based, application of the statute also supports the conclusion that defendants are entitled to assert their defense to the validity of the written agreement.

Section 38–10–124 was not intended to enable lenders to enforce fraudulently obtained written agreements. The General Assembly added § 38–10–124 to the statute of frauds in 1989. The section was a result of lobbying by the Colorado Bankers Association, which sought protection against suits alleging oral commitments to lend. Stephanie J. Shafter, *Limiting Lender Liability Through the Statute of Frauds,* 18 Colo. Law. 31, 1725 (1989) (citing *Landes Constr. v. Royal Bank,* 833 F.2d 1365 (9th Cir.1987) (upholding $18.5 million judgment against bank for breach of oral promise to lend)); *cf. Penthouse Int'l, Ltd. v. Dominion Fed. Sav. & Loan Ass'n,* 665 F.Supp. 301 (S.D.N.Y.1987) (reversing $129 million judgment against bank and its counsel for breach of $35 million participation commitment), *aff'd in part and rev'd in part,* 855 F.2d 963 (2d Cir.1988).

Thus, when a lender seeks to enforce a written agreement, permitting the defendant to assert defenses to the validity of the agreement is not contrary to the purpose of § 38–10–124.

## VI. Conclusion

Notwithstanding my disagreement with the majority's conclusion that § 38–10–124 prevents a debtor from presenting a defense of fraudulent inducement, I concur in the result because defendants did not allege that Premier had concealed, failed to disclose, or falsely represented a past or present fact, but rather alleged that Premier had falsely represented its future plans. In addition, the district court's conclusion that Fritzler's statements were too vague to imply an agreement to forbear with regard to enforcement of the note is supported by the record and dispositive of the question of whether defendants' alleged reliance on Fritzler's statements as representations of an intention to forbear were justified.

Hence, I conclude, as does the majority, that the district court properly did not rescind the deeds of trust and security agreements based on the defense of fraudulent inducement.