23CA0721 Dean v Casey 07-24-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0721
Arapahoe County District Court No. 21CV31592
Honorable Peter F. Michaelson, Judge

---

Amy F. Dean, Donner E. Dean, Jr., Merryl Learned, and John R. Walls, Jr.,

Plaintiffs-Appellees,

v.

Stephanie Casey, Trevor Casey, Wendy Brockman, and Clifton M. Brockman, Jr.,

Defendants-Appellants,

and

Stephen A. Fermelia, Mark Cohen, and Mark Cohen, J.D. L.L.M., a professional corporation,

Attorneys-Appellants.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE HARRIS
Lum and Graham*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 24, 2025

---

Brown Dunning Walker Fein Drusch PC, Neal K. Dunning, Scott W. Drusch, Greenwood Village, Colorado, for Plaintiffs-Appellees

Levin Sitcoff PC, Bradley A. Levin, Denver, Colorado; Western Slope Law, Nelson A. Waneka, Glenwood Springs, Colorado, for Defendants-Appellants

Mortiz Law LLC, Joel A. Mortiz, Stephen A. Fermelia, Denver, Colorado, for Attorney-Appellant Stephen A. Fermelia

Glade Voogt Lopez Smith Felser, PC, Andrew J. Felser, Denver, Colorado, for Attorneys-Appellants Mark Cohen and Mark Cohen, J.D., L.L.M.

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1	In this neighbor dispute involving the use and maintenance of two easements, defendants, Stephanie and Trevor Casey and Wendy and Clifton M. Brockman, appeal the final judgment, entered after a bench trial, enjoining them from obstructing the equestrian easement, appointing a receiver to oversee maintenance of the easements, and assessing attorney fees against them and their counsel for pursuing frivolous defenses and counterclaims. The defendants' counsel separately appeal that portion of the judgment assessing attorney fees against them.

¶ 2	We affirm in part, reverse in part, and remand the case to the trial court for further proceedings.

I.     Background

¶ 3     Mountain View Estates is a rural subdivision in Beyers, Colorado, consisting of twelve approximately thirty-five-acre lots. The subdivision is accessible by a private dirt and gravel road (the road easement) and encircled by a forty-foot-wide equestrian trail (the equestrian easement).

¶ 4     The plaintiffs (Amy F. and Donner E. Dean, Merryl Learned, and John R. Walls, Jr.) and the defendants own lots in the subdivision, as shown below:



The Lots and Easements of
Mountain View Estates

¶ 5     Ownership is subject to the "Conditions" incorporated into the owners' deeds.  The Conditions direct, among other things, that

2

"[a]ll easements shall be kept clear in a manner to allow their intended uses," and that "[p]urchasers of each lot" are "responsible for the maintenance of the [road easement]."

¶ 6    When the Caseys and Brockmans moved to the subdivision in 2016 and 2018 respectively, the "accepted practice in the community" was that lot owners — including all of the plaintiffs — had fences and gates placed across the equestrian easement. Some owners — including some of the plaintiffs — allowed their livestock to graze on the easement.

¶ 7    In 2020, the Brockmans erected fencing and gates on either end of their portion of the equestrian easement, with the intent to have livestock graze there. The following year, the Caseys built a fence with a gate across their portion of the easement. Around that same time, both the Brockmans and the Caseys constructed shooting berms near the equestrian easement.

¶ 8    In summer 2021, the Deans decided it was "time for everybody to come into compliance" with the Conditions, and most of the plaintiffs took down their fences and gates. When the Brockmans and Caseys refused to follow suit, the plaintiffs (including Learned, who still had a fence blocking the equestrian easement) filed this

3

action, asserting claims for trespass and nuisance and seeking injunctive and declaratory relief against the defendants, based on their alleged unreasonable interference with the equestrian easement. (With respect to the declaratory relief claim, the plaintiffs added all the other lot owners as defendants.)

¶ 9    The Brockmans and Caseys answered and asserted equitable defenses and counterclaims. The other lot owners (the defaulted lot owners) failed to respond to the complaint and collectively defaulted.

¶ 10    In several orders issued before trial, the court resolved certain of the defendants' counterclaims and related issues of law:

- The court agreed with the defendants that the equestrian easement was "nonexclusive," and, therefore, the defendants retained "the right to use the property in common with" the plaintiffs, "provided [their] use permit[ted] full use and enjoyment of the easement" by the plaintiffs.

- In a separate order, the court rejected the defendants' claims that lot owners were prohibited from maintaining any portions of the easements located on other owners' property. Rather, the court found that maintenance was a "collective obligation"

4

of the lot owners. In its order, the court sua sponte raised the possibility of appointing a receiver to manage maintenance of the road and equestrian easements. The plaintiffs consented to the appointment; the defendants objected.

- In a third order, the court granted the Caseys' motion for partial summary judgment on their counterclaim for injunctive relief and enjoined plaintiffs Walls and Learned from placing signs in the subdivision and blocking the equestrian easement.

¶ 11 In preparation for the bench trial, the parties submitted a joint trial management order (TMO) listing the following remaining claims and counterclaims to be resolved by the court:

- the plaintiffs' claims for trespass, nuisance and declaratory and injunctive relief relating to the defendants' placement of fencing, gates, and shooting berms on or near the equestrian easement;

- the Brockmans' counterclaims for abuse of process (based on the plaintiffs' lawsuit) and declaratory and injunctive relief (concerning their use of the equestrian easement); and

5

- the Caseys' counterclaims for invasion of privacy, trespass, breach of the Conditions, abuse of process (based on Amy Dean's application for a protection order against Stephanie Casey), civil conspiracy, and declaratory and injunctive relief.

¶ 12  At the trial management conference, the court characterized the case as a "declaratory judgment suit basically by both sides" concerning the permitted use of the equestrian easement. The court appeared skeptical that fences and gates across the easement would be permitted, but it acknowledged that "there is some law on [the defendants'] side." The court also expressed skepticism about the viability of some of the defendants' counterclaims, including their abuse of process claims and the Caseys' civil conspiracy claim, but after hearing explanations from counsel, it demurred, recognizing that assessing the claims was "why we're going to have a trial." There was no discussion of the defendants' equitable defenses of unclean hands, waiver/laches, or estoppel.

¶ 13  At trial, the defendants' primary theory of the case was that their fences and gates would not unreasonably interfere with the lot owners' use of the equestrian easement, as evidenced by the fact that fences and gates had existed on the easement for more than a

decade without incident. To that end, each side called an expert witness to opine on whether various obstructions would interfere with equestrian activities.

¶ 14 Relatedly, the defendants also elicited evidence to support an equitable theory that by keeping fences and gates on the easement until just before the lawsuit was filed (or, in Learned's case, for several months afterward), the plaintiffs could not seek to bar the defendants' conduct.

¶ 15 After three days of trial, during which the court alternated between admonishing the defendants for pursuing the defenses and counterclaims referenced in the TMO and seemingly retracting the admonishments, the court issued a final order and judgment that, as relevant here,

- required the defendants to remove any fences, gates, and berms from the equestrian easement; prohibited any lot owner from allowing livestock to graze on the equestrian easement; and required all lot owners to comply with the Conditions;

- entered judgment against Walls on one of the Caseys' counterclaims for trespass and awarded $800 in damages;

7

- appointed a receiver to manage maintenance of the road and equestrian easements, including collecting fees from all lot owners; and

- assessed one half of the plaintiffs' reasonable attorney fees against the defendants and their counsel, jointly and severally, as a sanction for pursuing frivolous, groundless, and vexatious defenses and counterclaims.

¶ 16 The defendants and their counsel now appeal. We first address the claims particular to the Brockmans and Caseys and then turn to the claim raised jointly by the defendants and their counsel — that the court erred by assessing attorney fees against them.

## II. The Defendants' Separate Claims on Appeal

¶ 17 The defendants seek reversal of the judgment on the grounds that (1) the trial court was biased against them, and (2) the court erred by determining that all lot owners have a right to maintain the easements and by appointing a receiver.

## A. The Trial Judge's Alleged Actual Bias

### 1. Additional Facts

¶ 18    On the first day of trial, the court acknowledged that it had not yet determined whether the defendants' equitable defenses applied to the plaintiffs' claims. Accordingly, it admitted evidence relevant to those defenses.

¶ 19    But a couple of hours later, after the lunch break, the court informed counsel that equitable defenses did not apply to written covenants that run with the land. It warned counsel not to "expect a positive result" if they continued to pursue the defenses.

¶ 20    At the end of the day, when counsel attempted to elicit testimony relevant to one of the equitable defenses, the court explained at length that the defenses did not apply and cautioned counsel that if it "heard any more examination . . . that goes to those defenses," counsel might "run into a contempt."

¶ 21    The next morning, the court clarified that the likely sanction for pursuing the defenses, which, based on the first day's evidence, "look[ed] frivolous," was not contempt but an award of attorney fees to the plaintiffs. Nonetheless, when counsel asked whether the court's admonitions meant that the equitable defenses "are out,"

the court insisted that it had not "made a decision yet" concerning the viability of the defenses and encouraged the attorney to do "what [he] th[ought] [wa]s right."

¶ 22    But later, when counsel attempted to admit evidence that a plaintiff's prior conduct was inconsistent with her current complaints about the condition of the easement, the court threatened to hold counsel in contempt.

¶ 23    The court also expressed frustration with the Caseys' civil conspiracy and invasion of privacy counterclaims and the Brockmans' abuse of process counterclaim.

¶ 24    The court understood the Caseys' civil conspiracy claim to be based on an allegation that the plaintiffs had attempted to induce Stephanie Casey into committing some sort of bad behavior in front of a law enforcement officer. But the court rejected that theory and warned counsel that if they could not present a more cogent theory, the court would "hold[] [counsel] in contempt for continuing to" pursue "unsubstantiated claims." With respect to the invasion of privacy claim, the court disagreed that the tort could be committed on "open property."

¶ 25     But by the third day of trial, after hearing argument from counsel, the court reconsidered its earlier position, acknowledging that the Caseys might have a viable theory for both claims.

¶ 26     The court was steadfast in its rejection of the Brockmans' abuse of process claim, however.  Toward the end of trial, the court demanded that counsel essentially abandon the claim or risk being held in contempt.

## 2.     Discussion

¶ 27     "A basic principle of our system of justice is that judges 'must be free of all taint of bias and partiality.'" *People in Interest of A.P.*, 2022 CO 24, ¶ 25 (quoting *People v. Julien*, 47 P.3d 1194, 1197 (Colo. 2002)).  Thus, under C.R.C.P. 97, a judge in a civil case must be disqualified if he is prejudiced or biased against a party or counsel to the litigation.  *Bocian v. Owners Ins. Co.*, 2020 COA 98, ¶ 13.  An actual bias is a bias "that in all probability will prevent [a judge] from dealing fairly with a party." *People in Interest of A.G.*, 262 P.3d 646, 650 (Colo. 2011) (alteration in original) (quoting *Julien*, 47 P.3d at 1197).

¶ 28    The defendants contend that the trial judge's threats to hold counsel in contempt demonstrated actual bias[1] requiring reversal of the judgment.  Reviewing that claim de novo, *see People v. Jennings*, 2021 COA 112, ¶ 27, we disagree.

¶ 29    A judge's remarks during the course of a trial that are "critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *People v. Dobler*, 2015 COA 25, ¶ 26; *see also Liteky v. United States*, 510 U.S. 540, 555-56 (1994) ("*Not* establishing bias or partiality . . . are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect [people] . . . sometimes display.").

¶ 30    The trial judge's comments here, while somewhat unprofessional and needlessly dramatic, showed hostility toward the defendants' *defenses and counterclaims* based on the evidence

---

[1] To the extent the defendants argue that the trial judge's comments created an appearance of bias requiring disqualification, that argument is waived based on their failure to file a motion to disqualify in the trial court.  *See People in Interest of A.P.*, 2022 CO 24, ¶ 29 n.2; *Rea v. Corr. Corp. of Am.*, 2012 COA 11, ¶¶ 22-23. But a claim of actual bias cannot be waived and, therefore, can be raised for the first time on appeal.  *See People in Interest of A.G.*, 262 P.3d 646, 651 (Colo. 2011).

introduced at trial and the court's own research, not toward the defendants themselves or their counsel. *See Liteky*, 510 U.S. at 555 (explaining that opinions formed by the judge based on the evidence at trial is generally not a basis for claiming bias or partiality). The record does not show that the trial judge had a "substantial bent of mind" against counsel such that he could not fairly consider counsel's arguments. *A.P.*, ¶ 30 (quoting *People v. Drake*, 748 P.2d 1237, 1249 (Colo. 1988)). To the contrary, the judge was sometimes persuaded by counsel's explanations to (temporarily, at least) reconsider his previous positions and evidentiary rulings.

¶ 31　Any argument that the trial judge misunderstood the parties' arguments or the law does not support a finding of actual bias. "[A]dverse legal rulings by a judge are unlikely to provide grounds for a bias claim, as they are proper grounds for appeal, not for recusal." *Id.* at ¶ 32.

¶ 32　And without any additional information, we cannot say that the trial judge's decision to recuse himself from the case *after final judgment entered* and shortly before he left the bench demonstrates actual bias *during the trial*. Allegations of bias cannot be based on

"mere suspicion, speculation, conjecture, or innuendo." *Bocian*, ¶ 44.

¶ 33     For these reasons, we reject the defendants' claim that the trial judge evinced actual bias requiring his disqualification.

> B.     The Maintenance Order and Appointment of a Receiver

¶ 34     Certain of the Conditions addressed maintenance of the easements:

> 11.   LOT MAINTENANCE
> The structures and grounds, including any open space, equestrian trails, and landscape or greenbelt area, of each lot shall be maintained in a neat and attractive manner. Special attention shall be given to the control of weeds, which may constitute a fire hazard.
>
> 13.   EASEMENT
> All easements shall be kept clear in a manner to allow their intended uses.
>
> 18.   ROAD MAINTENANCE
> Purchasers of each lot in the Mountain View Estates Subdivision are responsible for the maintenance of the private road known as East Briarwood Place.  This excludes any and all lots owned by [the developer].

¶ 35     Before trial, in an effort to limit access to their properties, the defendants requested a ruling that under the Conditions, each lot owner could perform maintenance only on those portions of the

14

easements located on that owner's property. The court denied the request and determined instead that maintenance of the easements was a "right and obligation of all of the lot owners," meaning that any lot owner could perform reasonable maintenance on any part of the equestrian or road easements.

¶ 36 But the court found that the parties were "incapable of safely and effectively" maintaining the easements. So, in the final order and judgment, it appointed a receiver under C.R.C.P. 66(a)(3) to oversee maintenance duties, including the collection of annual fees from all lot owners.

¶ 37 On appeal, the defendants contend that the court erred by determining that each lot owner has a right to perform maintenance on any portion of the easements and by appointing a receiver. We agree in part.

¶ 38 "Where there are several owners in common of an easement, each owner has a right to make reasonable repairs to the easement, so long as such [repairs] do not injuriously affect a co-owner." 28A C.J.S. *Easements* § 228, Westlaw (database updated May 2025); *see also Lazy Dog Ranch v. Telluray Ranch Corp.*, 965 P.2d 1229, 1238 (Colo. 1998) (the dominant estate holder may perform necessary

15

maintenance and make improvements to the easement as long as the maintenance and improvements do not unreasonably interfere with the enjoyment of the servient estate); *Story v. Bly*, 217 P.3d 872, 879 (Colo. App. 2008) (where dominant and servient estate owners share use of an easement, "it follows that the right to use the property engenders an equal right and obligation to maintain the property"), *aff'd*, 241 P.3d 529 (Colo. 2010).

¶ 39 The co-beneficiaries of an easement are free to determine the extent of their obligations to keep an easement in repair, but in the absence of an agreement or when the agreement is silent on this issue, the general rule applies: the beneficiaries of the easement generally share the maintenance obligation. *See* Restatement (Third) of Prop.: Servitudes § 4.13 (Am. L. Inst. 2000); *see also Lazy Dog*, 965 P.2d at 1237 (in the absence of an agreement, certain "default rules" concerning the parties' reasonable use and maintenance of the easement apply).

¶ 40 The defendants say that the Conditions contemplate that each lot owner "will maintain any easements on their land." True, but the fact that each lot owner has a duty to maintain their portion of the easement is not inconsistent with the general rule that each

easement holder has a right to maintain and improve any portion of the easement.

¶ 41    Nothing in the Conditions prohibits any easement holder from performing maintenance on a particular part of the equestrian or road easements.  The provision concerning "lot maintenance" requires that the "equestrian trail" on "each lot" be maintained "in a neat and attractive manner," but it does not specify who may or may not maintain the equestrian trail.  If the "lot maintenance" provision settled the matter, the Conditions would not also include a separate provision for maintenance of the "easements."  Moreover, the separate "road maintenance" provision says that "purchasers" of the lots are responsible for maintenance.

¶ 42    The defendants note that the Conditions do not specifically provide for a homeowners' association or a receiver.  But the absence of any such provision does not suggest an intent to preclude other lot owners from performing maintenance on the easements.

¶ 43    Accordingly, we discern no error in the court's order regarding the right of the easement holders to perform maintenance on the easements.

¶ 44    But we reach the opposite conclusion regarding appointment of the receiver.

¶ 45    Under C.R.C.P. 66(a), a "receiver may be appointed by the court in which the action is pending at any time." The appointment of a receiver is "an extraordinary remedy that should be employed with the utmost caution." *United States v. Solco I, LLC*, 962 F.3d 1244, 1250 (10th Cir. 2020) (quoting 12 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2983, Westlaw (3d ed. database updated Apr. 2020)).

¶ 46    We review the court's decision to appoint a receiver for an abuse of discretion. *Premier Farm Credit, PCA v. W-Cattle, LLC*, 155 P.3d 504, 512 (Colo. App. 2006). A court abuses its discretion if its ruling is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 47    Neither party requested a receiver or alleged that the lot owners were incapable of maintaining the easements. Nonetheless, the court concluded that without the appointment of a receiver to manage maintenance of the equestrian and road easements, the lot owners' use of the easements would be adversely affected. The court appointed a receiver with the authority to hire contractors, accountants, and other professionals, and it ordered each of the lot

owners to pay an initial retainer fee of $1,000 and an annual assessment of $2,000 for general maintenance of the easements. The receiver could obtain a judgment in the amount of any unpaid assessments and record the lien, allowing the receiver to foreclose on the lien if the judgment was not satisfied.

¶ 48 We see two problems with the court's order.

¶ 49 First, in appointing the receiver, the court granted relief against the defaulted lot owners that was not requested in the complaint. Under C.R.C.P. 54(c), a "judgment by default shall not be different in kind from that prayed for in the demand for judgment." Because neither party requested the appointment of a receiver, the court lacked authority to appoint one with respect to the defaulted lot owners or to order the defaulted lot owners to pay an annual maintenance fee. *See, e.g.*, *Toplitzky v. Schilt*, 361 P.2d 970, 972-73 (Colo. 1961) (court lacks authority to order relief against defaulting party that was not originally requested).

¶ 50 And if the receiver has no authority over the defaulted lot owners, the receiver's purpose cannot be accomplished. The court ordered the receiver to collect fees from *all* lot owners to cover the cost of maintaining and repairing the easements. The court did not

intend to place the full burden of maintaining the easements on the few lot owners involved in the litigation, and there would have been no basis for doing so. Each of the lot owners, as beneficiaries of the equestrian and road easements, were "obligated to contribute to the reasonable costs of repair and maintenance" of those easements. Restatement (Third) of Prop.: Servitudes § 4.13 cmt. e.

¶ 51 Second, the terms imposed were arbitrary. While the lot owners have a collective obligation to maintain the easements, "[t]he responsibility of each user should reflect a fair proportion of the costs," which will vary depending on the circumstances. *Id.* In imposing the terms, the court should have considered factors including "the amount and intensity of actual use and the value of other contributions made by the users to improvement and maintenance of the easement." *Id.* But without any explanation, the court simply ordered that each lot would be assessed an annual fee of $2,000 — an amount that is not tied to the lot owners' use of the easements or to any evidence of the expected annual cost of maintenance and repairs.

¶ 52 For these reasons, we reverse the court's order appointing a receiver.

### III. Challenge to the Court's Assessment of Attorney Fees

¶ 53    The defendants and their counsel contend that the trial court erred in assessing attorney fees against them because (1) the defenses and counterclaims were not frivolous, groundless, or vexatious; (2) the amount of the award was arbitrary; and (3) an award of interest on attorney fees is prohibited.

### A. Award of Attorney Fees for Frivolous, Groundless, or Vexatious Defenses and Counterclaims

#### 1. Legal Principles and Standard of Review

¶ 54    Under section 13-17-102(2), C.R.S. 2024, the court "shall award . . . reasonable attorney fees against any attorney or party who has brought or defended a civil action, either in whole or in part, that the court determines lacked substantial justification." "Lacked substantial justification" means "substantially frivolous, substantially groundless, or substantially vexatious." § 13-17-102(4).

¶ 55    A claim or defense is frivolous if the proponent can present no rational argument based on the evidence or the law to support the claim or defense. *Hawley v. Mowatt,* 160 P.3d 421, 427 (Colo. App. 2007). A claim or defense is groundless if the allegations in the

21

complaint or answer are not supported by any credible evidence at trial. *Id.* A claim or defense is vexatious if it is asserted or maintained in bad faith to annoy or harass another; vexatiousness includes conduct that is "arbitrary, abusive, stubbornly litigious, or disrespectful of the truth." *In re Estate of Shimizu*, 2016 COA 163, ¶ 26 (quoting *In re Parental Responsibilities Concerning I.M.*, 2013 COA 107, ¶ 29).

¶ 56 We review an award of attorney fees under section 13-17-102 for an abuse of discretion. *Andres Trucking Co. v. United Fire & Cas. Co.*, 2018 COA 144, ¶ 57. A court abuses its discretion where its decision rests on a misunderstanding or misapplication of the law, or is manifestly arbitrary, unreasonable, or unfair. *Estate of Shimizu*, ¶ 15.

2. The Court Abused Its Discretion by Awarding Attorney Fees in Connection With the Equitable Defenses and Certain Counterclaims

¶ 57 We agree with the defendants that the court misapplied the law when it found the equitable defenses and certain of the counterclaims frivolous, groundless, and vexatious and awarded attorney fees in connection those defenses and claims.

22

### a. Equitable Defenses

¶ 58 The court interpreted the defendants' equitable defenses as an effort to "obtain an order terminating" the equestrian easement based on a theory that the lot owners had "abandon[ed]" the easement or otherwise acted in a manner suggesting that the Conditions were "subject to termination." The court reasoned that the defenses were frivolous, as the validity of the easement could not be "affected by [the] equitable theories."

¶ 59 But the defendants' position was not that the easement or the Conditions had "terminated," or that the other lot owners had relinquished their right to use the easement. The equitable defenses were based on a theory that because the lot owners, including the plaintiffs, had used the easement for equestrian activities for more than a decade while maintaining fences and gates across it, the plaintiffs could not now complain that the defendants' conduct interfered with their enjoyment of the easement or otherwise violated the Conditions.

¶ 60 Under the doctrine of unclean hands, for example, the court will not consider a request for equitable relief — such as a mandatory injunction — under circumstances where "the litigant's

23

own acts offend the sense of equity to which he or she appeals."
*Ajay Sports, Inc. v. Casazza*, 1 P.3d 267, 276 (Colo. App. 2000).
The court concluded that the defense did not apply unless the
plaintiffs' conduct was "outrageous," but the law requires only
"improper conduct" that "relate[s] directly to the underlying
litigation." *Id.* The defendants argued that the plaintiffs' own
violations of the Conditions (their improper conduct) precluded
them from obtaining equitable relief.

¶ 61 And contrary to the plaintiffs' argument, the Caseys did not
forfeit their equitable defenses by seeking to enforce the Conditions
against Learned. The defendants' position was that the Conditions
permitted lot owners to construct fences with unlocked gates on
their property because those improvements did not interfere with
other lot owners' use of the equestrian easement. But, as the court
found, Learned had constructed a fence without a gate that
completely blocked access to a portion of the easement.

¶ 62 As for the defenses of estoppel and waiver/laches, the court
determined that as a matter of law, those theories could not
"affect[]" the equestrian easement, which was documented in
written covenants that run with the land.

¶ 63    According to the court, the estoppel defense was frivolous because the defendants had "full knowledge of the equestrian easement prior to purchasing [their] lot[s]." On appeal, the plaintiffs adopt that reasoning, arguing that the defense was irrational because a person "cannot ignore express covenants that an Easement shall be kept clear for its intended use," even if the person sees gates and fences on the easement.

¶ 64    But again, the trial court and now the plaintiffs have misconstrued the defendants' theory of defense. The defendants did not deny knowledge of the easement or the Conditions. Rather, their theory was that the plaintiffs' conduct led them to reasonably believe that the Conditions were not incompatible with the maintenance of fences and gates and the grazing of livestock. *See Barker v. Jeremiasen*, 676 P.2d 1259, 1262 (Colo. App. 1984) (The elements of equitable defense of estoppel are "full knowledge of the facts; unreasonable delay in the assertion of [an] available remedy; and intervening reliance by and prejudice to another."). The court did not explain why that particular theory was frivolous. *See Padilla v. Ghuman*, 183 P.3d 653, 662 (Colo. App. 2007) (where the trial court awards attorney fees under section 13-17-102 without

making specific findings to support the award, the court abuses its discretion).

¶ 65 And to the extent the trial court concluded that estoppel can never bar enforcement of written covenants, we are unaware of any case that supports that proposition. Even when written covenants are "clear on their face," "equity may fashion a remedy to effect justice suitable to the circumstances of the case." *Woodmoor Imp. Ass'n v. Brenner*, 919 P.2d 928, 931 (Colo. App. 1996) (equitable estoppel barred homeowners' association from enforcing a restrictive covenant against a homeowner); *see also Lookout Mountain Paradise Hills Homeowners' Ass'n v. Viewpoint Assocs.*, 867 P.2d 70, 76-77 (Colo. App. 1993) (considering whether equitable defenses, including estoppel, barred a homeowners' association from enforcing a covenant). At oral argument, the plaintiffs claimed that *Woodmoor* and *Lookout Mountain* stand for the proposition that only a homeowners' association can assert equitable defenses, but they offered no authority to support that claim and we are not aware of any.

¶ 66 Finally, the defendants say they had a rational basis for asserting the defenses of waiver/laches, but our review of the

26

record does not reveal that the defendants actually pursued these defenses at trial, separate and apart from the other equitable defenses. The court's order does not provide any basis for concluding otherwise.

¶ 67     In sum, we conclude that the court abused its discretion in awarding attorney fees based on a finding that the equitable defenses were frivolous, groundless, or vexatious.

### b.     Trespass

¶ 68     The Caseys asserted a counterclaim for three incidences of trespass. The court found that Walls and Amy Dean "at times have intentionally entered upon" the Caseys' property, and that one of Walls' trespasses caused $800 in damages.

¶ 69     Nonetheless, the court appeared to find that certain of the trespass claims were frivolous or groundless based on a lack of evidence that the trespasses caused "physical damage to the Caseys' property." Assuming this was the basis of the court's frivolousness finding, the court erred.

¶ 70     Ordinarily, to prove a trespass, the proponent of the claim must show that another person physically intruded on her property without permission; the proponent need not show physical damage.

*Pub. Serv. Co. of Colo. v. Van Wyk*, 27 P.3d 377, 389 (Colo. 2001) ("By intentionally entering the land possessed by someone else, or causing a thing or third person to enter the land, an individual becomes subject to liability for trespass, whether or not he caused harm to any legally protected interest of the landowner."). A showing of physical damage is necessary only when the trespass involves an intangible intrusion. *Id.*

¶ 71   The trespass counterclaim did not involve allegations of an intangible intrusion. Thus, the court misapplied the law in determining that the claim was frivolous, groundless, or vexatious because the Caseys failed to demonstrate physical damage.

¶ 72   And contrary to the plaintiffs' argument on appeal, the fact that their trespasses might have been "innocent" or "trivial" is irrelevant. Liability for trespass requires only an intent to do the act that itself constitutes the intrusion. *See Antolovich v. Brown Grp. Retail, Inc.*, 183 P.3d 582, 603 (Colo. App. 2007). A culpable state of mind is not an element of the tort.

¶ 73   Thus, the award of attorney fees related to the trespass claim cannot stand.

28

### c.    Intrusion Upon Seclusion

¶ 74    The Caseys asserted a counterclaim for invasion of privacy by intrusion upon seclusion,[2] supported by evidence that Walls had repeatedly parked at the entrance to the Caseys' driveway and stared or sometimes honked and yelled at Stephanie Casey while she was in the house.

¶ 75    As noted, by the last day of trial, the court appeared to agree that the Caseys had a viable invasion of privacy claim. Nonetheless, in the final order and judgment, the court found that the claim lacked a "legal basis." According to the court, an intrusion upon seclusion claim could not be based on acts committed by a person "present on a common road or other common space," unless the person used "an enhanced viewer, such as a camera," to penetrate into the other person's home.

¶ 76    To prevail on a claim for intrusion upon seclusion, the Caseys had to show that another person "intentionally intruded, physically

---

[2] In Colorado, an invasion of privacy claim encompasses three distinct torts: unreasonable intrusion upon the seclusion of another, unreasonable publicity given to another's private life, and appropriation of another's name or likeness. *Pearson v. Kancilia*, 70 P.3d 594, 598-99 (Colo. App. 2003).

or otherwise, upon [their] seclusion or solitude, and that such intrusion would be considered offensive by a reasonable person." *Doe v. High-Tech Inst., Inc.*, 972 P.2d 1060, 1065 (Colo. App. 1998).

¶ 77 The court's interpretation of the claim is not supported by the relevant authority. True, a claim would not lie if *Stephanie Casey's* "appearance [wa]s public and open to the public eye." Restatement (Second) of Torts § 652B cmt. c (Am. L. Inst. 1977), Westlaw (database updated Oct. 2024). But the fact that *Walls* was in a public place would not categorically defeat the claim, much less render it frivolous, if he, from his public vantage point, nevertheless intruded on Stephanie Casey's seclusion.

¶ 78 Under the court's interpretation of the law, a person who stands on a public sidewalk, only feet away from another person's home, and yells obscenities for hours at the person inside is not liable for intruding on the other person's seclusion. That interpretation disregards that one "type[] of invasion intrinsic in the tort of intrusion upon seclusion [is] . . . harassment." *Wolf v. Regardie*, 553 A.2d 1213, 1217 (D.C. 1989); *see also Doe*, 972 P.2d at 1067 (recognizing that repeated and harassing phone calls give rise to an intrusion upon seclusion claim).

¶ 79 To the extent the court relied on *Sundheim v. Board of County Commissioners*, 904 P.2d 1337 (Colo. App. 1995), to support the frivolousness finding, its reliance was misplaced. In that case, the division affirmed summary judgment against the plaintiffs on their invasion of privacy claim where the county's investigator observed things on the premises either "plainly visible to the public" or visible to him because he had been "invited onto the property" by the lessee. *Id.* at 1351. The division noted, though, that business premises are "open to intrusions that would not be permissible in purely private circumstances." *Id.* Given the inapposite context, *Sundheim* is not instructive here.

¶ 80 The court's only basis for finding the invasion of privacy claim frivolous, groundless, or vexatious amounted to a misapplication of the law. Thus, we conclude that the court abused its discretion in awarding attorney fees in connection with this claim.

3. The Court Did Not Abuse Its Discretion by Awarding Attorney Fees in Connection with the Remaining Counterclaims

¶ 81 We disagree, however, that the court abused its discretion by awarding attorney fees in connection with the defendants' counterclaims for abuse of process and civil conspiracy.

### a. Abuse of Process

¶ 82    The Caseys asserted an abuse of process counterclaim against all plaintiffs based on Amy Dean's application for a protection order against Stephanie Casey. The Brockmans asserted an abuse of process counterclaim based on the plaintiffs' filing of the instant lawsuit.

¶ 83    To prove an abuse of process claim, the proponent must establish "(1) an ulterior purpose for the use of a judicial proceeding; (2) willful action in the use of that process which is not proper in the regular course of the proceedings, i.e., use of a legal proceeding in an improper manner; and (3) resulting damage." *Parks v. Edward Dale Parrish LLC*, 2019 COA 19, ¶ 12 (quoting *Mackall v. JPMorgan Chase Bank, N.A.*, 2014 COA 120, ¶ 39).

¶ 84    The second element — improper use — is "[t]he essential element of an abuse of process claim," and it is distinct from the "ulterior purpose" element. *Active Release Techs., LLC v. Xtomic, LLC*, 2017 COA 14, ¶ 6 (citations omitted). The improper use must involve an "actual court process" that is "unrelated to, or outside the scope of, the action filed." *Id.* at ¶¶ 9-10.

¶ 85    The trial court found that the defendants had failed to present any evidence to support the improper manner element.

¶ 86    On appeal, the Caseys say that, based on the timing, a "reasonable inference is that the [application for a protection order] was filed to intimidate and/or harass [Stephanie] Casey or obtain an advantage in [the easement dispute]." That cursory argument, styled in the disjunctive, demonstrates that the Caseys still have not developed any cognizable theory of the claim. Nor do they point to any evidence showing that the protection order proceeding was used to gain leverage or otherwise coerce the Caseys into taking some action.

¶ 87    The Brockmans do not attempt to show the improper use of a legal proceeding or process that is "unrelated to, or outside the scope of, the action filed." *Id.* Their argument is only that the plaintiffs filed "the instant lawsuit" for an ulterior purpose. But "[i]f the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint[,] there is no abuse, even if the plaintiff had an ulterior motive in bringing the action or if he knowingly brought suit upon an unfounded claim." *Colo. Cmty. Bank v. Hoffman*, 2013 COA 146, ¶ 37 (quoting

*Sterenbuch v. Goss*, 266 P.3d 428, 439 (Colo. App. 2011)). In other words, the mere filing of a lawsuit cannot be the basis of an abuse of process claim.

¶ 88　Accordingly, we conclude that the trial court did not abuse its discretion in awarding attorney fees in connection with these counterclaims.

### b.　Civil Conspiracy

¶ 89　The Caseys asserted a counterclaim for civil conspiracy, alleging that the plaintiffs conspired to harass them and to induce them to commit an illegal act in retaliation for the Caseys' refusal to consent to proposed amendments to the Conditions. At trial, the Caseys also claimed that the plaintiffs conspired to invade their privacy.

¶ 90　The elements of civil conspiracy are (1) an object to be accomplished; (2) an agreement by two or more persons on a course of action to accomplish that object; (3) one or more unlawful overt acts; and (4) resulting damages. *See Rosenblum v. Budd*, 2023 COA 72, ¶ 51. Civil conspiracy is a derivative cause of action. *Double Oak Contr., L.L.C. v. Cornerstone Dev. Int'l, L.L.C.*, 97 P.3d 140, 146 (Colo. App. 2003), *overruled on other grounds by L.H.M. Corp., TCD*

*v. Martinez*, 2021 CO 78, ¶ 24. "If the acts alleged to constitute the underlying wrong provide no cause of action, then there is no cause of action for the conspiracy itself." *Id.*

¶ 91 The court found that the Caseys had failed to present any evidence that the plaintiffs agreed to pursue any unlawful overt act.

¶ 92 On appeal, the Caseys say the plaintiffs "conspired to harass them and get them in trouble with the law." They point to a group text discussing a plan to "goad" Stephanie Casey into committing a trespass and to a letter from the Deans recommending the formation of an "HOA-like entity." But these acts are not unlawful. As for Walls' conduct in driving around the Caseys' home, the Caseys did not present any evidence that the plaintiffs had a part in Walls' decision to engage in that conduct. Nor was there evidence that the plaintiffs formed an agreement to invade the Caseys' privacy.

¶ 93 While a civil conspiracy may be implied by a course of conduct and other circumstantial evidence, a court may not infer a conspiracy absent some proof of an agreement. *See Rosenblum*, ¶ 52. The proponent of the claim must present "some indicia of

agreement in an unlawful means or end." *Id.* (quoting *Schneider v. Midtown Motor Co.*, 854 P.2d 1322, 1327 (Colo. App. 1992)).

¶ 94     Because the Caseys failed to present any evidence to support their civil conspiracy claim, we cannot say that the court abused its discretion in awarding attorney fees in connection with this claim.

B.     Attorney Fee Issues Likely to Arise on Remand

¶ 95     Having concluded that the court abused its discretion in awarding attorney fees in connection with the defendants' equitable defenses and certain of the counterclaims, we must reverse that portion of the judgment and remand to the trial court for reconsideration of an award of fees.

¶ 96     In light of our disposition, we need not resolve the defendants' other challenges to the attorney fee award. However, should those challenges arise on remand, we note that a "movant must . . . establish a reasonable proration of attorney fees incurred relative to the defense of a frivolous or groundless claim." *Farmers Reservoir & Irrigation Co. v. City of Golden*, 113 P.3d 119, 126 (Colo. 2005). Here, the trial judge sua sponte awarded the plaintiffs one half of their attorney fees without requiring the plaintiffs to show any

connection between the frivolous counterclaims and the fees incurred.

¶ 97　Additionally, we agree with the defendants that a court may not award interest on attorney fees awarded under section 13-17-102. *See id.* at 133-35.

### IV.　The Plaintiffs' Request for Appellate Attorney Fees

¶ 98　The plaintiffs seek an award of their appellate attorney fees under C.A.R. 39.1, contending that the defendants' appeal is frivolous and groundless.

¶ 99　But the defendants have prevailed on a number of their claims, *see Andres Trucking Co.,* ¶ 62 (declining to award appellate attorney fees when the other party prevailed on appeal), and while they did not prevail on others, we do not agree that an award of fees is warranted, *see Glover v. Serratoga Falls LLC*, 2021 CO 77, ¶ 70 (noting that the court awards appellate attorney fees only in clear and unequivocal cases of egregious conduct where no rational argument is presented).

### V.　Disposition

¶ 100　Those portions of the judgment appointing a receiver and assessing $97,651.68 in attorney fees and costs against the

defendants and their counsel, jointly and severally, pursuant to section 13-17-102, are reversed, and the case is remanded for reconsideration of an award of attorney fees. In all other respects, the judgment is affirmed.

JUDGE LUM and JUDGE GRAHAM concur.